652 So.2d 707 (1995)
CENTURY 21 DEEP SOUTH PROPERTIES, LTD.
v.
Bobby Norris KEYS.
No. 91-CA-00757-SCT.
Supreme Court of Mississippi.
March 9, 1995.
*708 Gary L. Geeslin, Lipscomb Geeslin & McClanahan, Columbus, for appellant.
H. Russell Rogers, Gholson Hicks Nichols & Ward, Starkville, for appellee.
Before HAWKINS, C.J., and McRAE and JAMES L. ROBERTS, Jr., JJ.
HAWKINS, Chief Justice, for the Court:
On June 14, 1990, Century 21 Deep South Properties, Ltd. (hereinafter Century 21) filed its Complaint for Discovery, Accounting and Damages against Bobby Norris Keys in Lowndes County Chancery Court. Keys replied and countersued Century 21 with his Answer to Complaint for Discovery, Accounting and Damages with Counter-Claim on July 19, 1990. Century 21 responded in turn with its Answer to Counter-Claim on September 13, 1990. For the remainder of 1990 and the first quarter of 1991, the parties engaged in extensive discovery. A hearing was then held before Judge Robert L. Lancaster on April 24 and 25, 1991. On May 10, 1991, Judge Lancaster issued an opinion of the Court.
Four days later, Century 21 filed a Motion to Amend Findings and Conclusions or to Alter or Amend Judgment. On May 17, 1991, Keys answered Century 21's motion with a Defendant's Response to Plaintiff's Motion to Amend Findings/Conclusions or to Alter/Amend Judgment and a Motion and Incorporated Memorandum for Post Judgment Relief. Century 21 immediately responded with their Plaintiff's Reply as to Plaintiff's Motion to Alter or Amend Etc. and Plaintiff's Response to Defendant's Motion *709 for Post-Judgment Relief. A hearing on these motions was held on May 30, 1991, and on June 12, 1991, Judge Lancaster issued a second opinion of the Court.
Judge Lancaster handed down his final Judgment on June 26, 1991. Century 21 filed their Notice of Appeal exactly one month later and on August 9, 1991, Keys filed his Notice of Cross Appeal.

FACTS
The seeds of this case were planted in 1956. In that year Bobby Keys and Tommy Vice formed a partnership to sell real estate named Keys and Vice Realtors. Twenty years later, in 1976, the partnership became Century 21 Keys and Vice Real Estate Agency, Inc., a corporation with Keys and Vice serving as equal shareholders. On March 19, 1981, the corporation redeemed Keys' stock leaving Vice as the sole shareholder. The agreement which redeemed Bobby Keys' stock also made Keys and his wife, Beth, independent contractors for the corporation. The clause which does so says in part:
Purchaser, after the consummation of the sale and redemption of the corporate stock provided for herein, does hereby agree to employ Seller and his wife, Elizabeth V. Keys, as independent contractors for the sale of commercial, residential and/or farm properties in accordance with the policies and procedures of Seller whether now existing or hereafter established, governing all actions and conduct of employees and/or independent contractors of Seller and further in accordance with the standard independent contractor employment now existing or hereafter amended and/or established by the Purchaser with the exception that any such contractor employment agreement shall contain the following provisions relative to Seller and wife: Said employment shall be guaranteed for a period of three (3) years from the date hereof. During such employment or any extension thereof, Seller and his wife shall be guaranteed sales commissions of thirty-five percent (35%) of commissions on listings plus forty-five percent (45%) of commissions on sales (a total of 80% of commissions in transactions where either party is both the listing and selling agent.)
The working relationship of the parties was governed by this agreement until February 1, 1985, when Keys and the corporation, then called Century 21 Deep South Properties, Ltd., entered into a new real estate sales commission contract. Under this contract, Keys was to act as a "real estate salesman" as defined under Miss. Code Ann. § 73-35-3(4) (1972). The contract further stated that:
Salesman shall become thoroughly familiar with and be governed by the Code of Ethics of the National Association of Realtors and the applicable laws of the State of Mississippi with respect to the sale of real estate and the by-laws and regulations of the Lowndes County Board of Realtors. Salesman shall also become thoroughly familiar with the current "Policies and Procedures" of CENTURY 21 DEEP SOUTH PROPERTIES, LTD. and shall be governed by same. The current "Policies and Procedures" of CENTURY 21 DEEP SOUTH PROPERTIES, LTD. shall be an extension of this contract.
One of the "Policies and Procedures" incorporated into the contract by reference is Policy L-1 which deals with salespersons buying and selling on their own account:
There will be times when a salesperson desires to buy or sell property for his own account. When buying properties, the salesperson will obtain permission of the agency for this action. The agency has first refusal on the purchase and if the agency refuses, then the salesperson may buy the property for his own account. A full sales commission will be paid by the seller to the agency. It is important to advise the seller that the agent is buying for his own account. (Emphasis ours)
....
When the salesperson sells property that he owns, other than his homestead or personal residence, the commission fee to the agency will be waived on one sale annually. If there is more than one sale annually, the seller will pay the full commission to the agency. It is the intent of management to encourage sales associates to invest in real *710 estate for their future. Accordingly, this waiver of commission shall apply to those properties that meet the IRS requirements and definitions of property held for investment. This means property must be held for a minimum of one (1) year prior to selling. Property that is sold within a period less than one (1) year, a full commission will be due to the agency.
The above policy was first implemented in 1983 and was revised in 1987.[1]
Policy G-1 dealing with commission fees and commission splits was also incorporated into the 1985 contract. It states specifically that, "On all lots, acreage and farms, the commission fee will be 10%, but not less than $1,000.00." Another item incorporated into the contract was Policy G-3 which dealt with annual commission splits. This detailed document was discussed by Tommy Vice while being questioned by his attorney, Gary Geeslin, at the April 24, 1991, hearing:
Q. BY GEESLIN:
All right. Now, this document is somewhat complex. It appears that one would need to know the number of million dollar producers in the agency before you can actually determine what the split is. Can you or do you have recollection of or personal knowledge of the number of million dollar producers in the agency was at this relevant time?
A. BY VICE:
Yes, at the time this became effective and the changes were made to incorporate this, there were six.
Q. Six?
A. Six Million dollar producers.
Q. All right. Then if you look over to the column on the right hand side where the six million dollar producers, then what is the, if you were dealing with what is called an in-house, in other words, no other real estate company or agency was involved and it was all in the agency, what would be the split between the agency and the individual agent, salesperson?
A. The agent would receive 75 percent, the agency would receive 25 percent.
The final item to be incorporated into the contract was Policy A-14 dealing with a sales associate's termination. The version of this policy that was in effect on February 1, 1985, states in pertinent part:
Those transactions which the terminating sales associate has initiated and are in the process of closing shall be assessed at 50% of the terminating sales associates commission for follow-up action by management in order to complete the transactions.
This policy was revised on May 1, 1986. The new version of the above clause reads:
Those transactions which the terminating sales associate has initiated and are in the process of closing shall be paid to the sales associate based on 50% of the current CENTURY 21 DEEP SOUTH PROPERTIES commission schedule as outlined in the POLICY & PROCEDURE manual.
Bobby Keys operated as a sales associate for Century 21 Deep South Properties under the 1985 contract complete with all of the incorporated documents until April 1989.
In addition to witnessing the signing of the above new contract, 1985 also saw the start of the Sweetbriar subdivision. Keys' exact role in the development of Sweetbriar was an object of great dispute in the case below, with Keys stating that he and Columbus attorney Aubrey Nichols were equal partners in the subdivision's development and Century 21 claiming that no such partnership existed. Keys testified that the idea for Sweetbriar came in a 1985 conversation that he and Nichols had about a nearby piece of land. According to Keys, this conversation led to further inquiries about the property and the forming of a partnership for the development of the subdivision.
There is little physical evidence of the Keys/Nichols partnership. First, the partnership agreement was never reduced to writing. Second, Keys' name does not appear on the July 31, 1985, Warranty Deed of *711 the land from the Leigh family that was to become Sweetbriar; the August 15, 1985, Land Deed of Trust with Merchant Farmers Bank for the $140,000 that was used to buy the Sweetbriar property; or the November 26, 1985, listing of Sweetbriar's restrictive covenants and conditions. Furthermore, aside from two deeds in which Keys was the grantee, none of the deeds issued to the purchasers of the Sweetbriar lots bears his name either. The only member of the supposed partnership whose name appears on each of these documents is Aubrey Nichols.
Nichols explained on cross-examination why the partnership was set up and operated like this:
I told him (Keys) that I wanted to do it. I had developed a subdivision out in east Columbus and I enjoy those type things and I wanted to be involved in it. I wanted to handle the negotiations. I wanted to be the primary partner involved in the transaction... .
He further stated:
It was very important to me to develop this and to not have to worry about running Bob down or running a partner down. I wanted to develop it myself from the standpoint of handling the financial package, dealing with the bank and that type of thing.
Keys' explanation corroborates that of Nichols: "He [Nichols] wanted complete control and didn't want to have to run me down to try to get my signature on any thing."
There is, however, corroboration of Nichols and Keys' claim of a partnership or joint venture. According to a promisory note from Merchants and Farmers bank, Keys and Nichols jointly borrowed $10,000 on May 24, 1985. Keys testified that this loan was for earnest money to send to the owners of the Sweetbriar property. Furthermore, the capital gains tax returns for Bobby and Elizabeth Keys and for Aubrey and Beverly Nichols show almost identical land transactions in 1985-1988. On their 1985 return, the Nichols listed a land deal described as "1/2 INT 4 RES LOTS" with a gross sales price of $70,000, costs or other basis of $37,951, and a gain of $32,049. The Keys on their 1985 return described a transaction as "FOUR LOTS" and gave an identical gross sales price, basis, and gain. Further similarities regarding the sale of lots abound through both sets of tax returns for the following three years, including three more sets of identical gross sales prices, bases and gains. There is some discrepancy as to the dates of some of these transactions but these differences are, for the most part, extremely slight.
There are also identical entries on both the Keys' and Nichols' Schedule A itemized deductions for 1987 and 1988. In 1987 the Nichols entered under the category of real estate taxes $823.00 and described the entry on the form as "$823 of the property taxes pertain [sic] to Sweetbriar." They also entered $4296 as Deductible investment interest and described it as "$4296 of the investment interest pertain [sic] to Sweetbriar." The Keys made identical entries in both categories in 1987, describing the former as "$823.00 of the property taxes pertain [sic] to joint venture" and the latter as "$4296 of the investment interest pertain [sic] to the joint venture." Identical entries were again made by both the Keys and Nichols under the categories of real estate taxes and deductible investment interest in 1988, and the same type of language was again used to explain the entries.
The record further contains copies of three checks written by Keys in 1987 and 1988 which all in some way bear the name Sweetbriar. Another check of note was written on April 9, 1991, well after the commencement of this case, from Nichols to Keys from the Aubrey Nichols Development Account. According to Keys, this check represented his half interest in a jointly held CD in the name of Sweetbriar Development Company. The final set of exhibits introduced at the hearing was a series of letters written by Nichols to Keys between January 1986 and April 1991 regarding the Sweetbriar development. One of the most telling of these missives in the first one, dated January 9, 1986:

*712 Dear Bob:
By the time you get this I probably will have reached you by telephone, but I wanted to reduce this to writing anyway.
On January 8 I borrowed $35,000 from the Merchants & Farmers Bank which is to be used in a matter independent of our Sweetbriar Development. Because time was of the essence, the loan was posted on the Sweetbriar deed of trust. I hereby confirm that this $35,000 loan is mine alone, and I will be fully responsible for the payment of all interest or other expenses incurred as a result thereof. I also hope to either have it paid or have it transferred to Lot 6 only before our final adjustments are made on the development of the subdivision.
In any event, hold this letter to confirm this matter in the event something happens to me.
 Sincerely,
 s/ Aubrey E. Nichols
Other letters concern topics such as notes on the Sweetbriar property, service charges on the Sweetbriar checking account and conversations with Mississippi Valley Gas, and the transfer of a Sweetbriar deed.
Several witnesses testified at the hearing about their dealings with Bobby Keys in regard to the Sweetbriar development. Among these witnesses were Faye Rector, Linda Gates, Doris Hardy, and Eddie Bozeman. It bears noting that both Rector and Gates were at the time of the hearing employees in some form or another of Century 21 Deep South Properties. All four of these witnesses testified that Bobby Keys showed them lots in Sweetbriar and that he never told them that he was one of the subdivision's developers. Furthermore, according to Gates, Hardy, and Bozeman, Keys specifically told them or implied to them that Aubrey Nichols was Sweetbriar's developer. Finally, according to Hardy and Bozeman, Keys said that his only form of compensation for showing the lots was a discount on a lot that he was buying.
On February 24, 1988, Lot 5 of the Sweetbriar subdivision was deeded to Bobby Keys. A little over a year later, on March 16, 1989, Lot 13 was also deeded to Bobby Keys. Nichols similarly was deeded Lot 6 and Lot 14. According to Keys, he and Nichols received the lots as a division of the remaining partnership properties and that neither he nor Nichols paid any amount of consideration for the lots. At the hearing, real estate appraiser Lynn Scoggin valued the two lots deeded to Keys at $135,000. Although there was not an appraisal of the two lots deeded to Nichols in the record, they were located adjacent to and were approximately the same size as those deeded to Keys.
The remaining 10 lots were sold between 1985 and 1988. In 1985 four lots were sold  Lot 8 to Michael and Mary Belinda Duckworth for $35,000; Lot 10 to Edward and Martha Bozeman for $35,000; Lot 11 to William and Jane Ford for $35,000; and Lot 12 to Wayne and Doris Hardy for $35,000. In 1986 James and Gayle Glenn bought Lot 2 for $35,000 and one year later bought Lot 1 for $19,000. Three more properties were also sold in 1987  Lot 4 to James and Gladys Spain for $27,500; Lot 7 to Oliver and Helen Phillips for $35,000; and Lot 9 to William and Jane McDaniel for $35,000. The last lot to be sold was Lot 3, sold to Richard and Sharon Garner in 1988 for $23,000.
Tommy Vice was aware of the Sweetbriar project while it was being developed. Indeed, he testified that he discussed Sweetbriar with Keys well before the start of the case at bar. According to Vice, their first conversation on the subject consisted of little more than Keys telling him that he intended to buy a Sweetbriar lot. Their next discussion was more substantial:
After the subdivision got going, people on the street mentioned to me, several different people stated that Bob was, heard that Bob was promoting the area, something to the fact that he was promoting the area. So I questioned Bob one day about it and Bob said, "Oh no, that is Aubrey Nichols' subdivision." He said, "I bought a lot out there," and that is basically what he said.
According to Keys, neither of these conversations ever took place.
Some time after talking to Keys about Sweetbriar, Vice asked Aubrey Nichols if he would be interested in giving Century 21 a *713 listing. Vice discussed the circumstances of that conversation at the hearing:
[I]n early 1988, Linda Gates, a sales associate with our firm, came to me and asked me would I call Aubrey Nichols and get information on that subdivision. That she had some prospects that wanted to look at higher end lots and I told her that I would be glad to and I called Aubrey and asked information about it and Aubrey would not give a listing on it.
Vice also testified that he later had a second conversation with Nichols. According to Vice, Nichols did not indicate at any time during either of these conversations that he and Keys were partners in the Sweetbriar development.
After hearing comments from others about Keys' involvement in Sweetbriar, Vice began to investigate the subdivision more closely. These investigations led to Vice ordering his attorney, Gary Geeslin, to send a letter to Keys on May 10, 1990 requesting that he clarify his connection with the development. This letter reads in pertinent part:
My investigation to date indicates that while you were operating as a Commissioned Salesperson under contract with Century 21 Deep South Properties., Ltd., you procured several sales of lots in Sweetbriar Subdivision. No commissions on the sales of these lots were reported to Century 21 Deep South Properties, Ltd.
Moreover, during the same period of time, you acquired Lots 5 and 13 of the subdivision, Lot 5 having been re-conveyed by you to your children. No contract in connection with either purchase went through Century 21 Deep South Properties, Ltd.
Based upon the investigation to date, my client is greatly concerned that the following has occurred:
(a) You have accepted a commission as a real estate salesperson without reporting the same to Century 21 Deep South Properties, Ltd.;
(b) You have received a rebate or discount in connection with your purchase of the lots without reporting the same to Century 21 Deep South Properties, Ltd.; or
(c) Both of the above.
In any event, such activity would be in violation of your independent contractor agreement, the rules and regulations of the state and local governing agencies, as well as the Mississippi statutes.
The letter goes on to request that Keys give several documents to Vice and Century 21 so that they might calculate the agency's proper share of Keys' unreported Sweetbriar earnings if any.
Keys responded to this letter on May 16, 1990. His reply says in part:
Dear Gary:
I received your letter dated May 10 advising that you are representing Tommy Vice and are preparing to litigate a claim against me because of my involvement in Sweetbriar Subdivision.
Although I owe no explanation to Tommy Vice regarding any of my activities, I am advising you that your assumptions and statements in your letter of May 10 are totally incorrect. If you had completed an investigation as you indicate in your letter, you would not have reached the conclusions you did since there is no truth to your allegations.
Tommy Vice knows that I have never accepted commissions which were not reported nor have I received any rebates or discounts in connection with my purchase of any lots.
A reasonable investigation of this matter would have revealed that I was a partner in a joint venture in the development of Sweetbriar Subdivision and all of my activities which were very limited resulted directly from my co-ownership of the property. (Emphasis original.)
Less than a month after Keys sent this letter, Vice filed his Complaint for Discovery, Accounting, and Damages. Part IX of Vice's complaint recounts Keys' above admission that he was a partner in the Sweetbriar partnership. Part X then discusses the legal consequences of Keys being in such a partnership. In his Answer to Complaint for Discovery, Accounting and Damages with *714 Counter-claim, Keys admitted that he sent the May 16, 1990, reply to Vice and denied Vice's Part X allegations.
After extensive discovery and the April 24-25, 1991, hearing, Judge Lancaster handed down a lengthy Opinion of the Court on May 10, 1991. In it Judge Lancaster found that a partnership to develop Sweetbriar existed between Nichols and Keys. The judge further found that both the first and third paragraphs of Century 21's Policy L-1 were ambiguous and potentially harsh and unreasonable. Judge Lancaster finally interpreted the contract so as to say that Century 21 was entitled to a 2.5% fee on the sales price of the undivided one half equitable interest sold by Keys, subject to the waiver of one sale per calendar year and to the waiver of any commission on all sales of property held for investment for more than one year. This Opinion of the Court inspired motions by both Century 21 and Keys calling for various modifications of the court's findings. A hearing on these motions was held on May 30, 1991, and on June 12, 1991, Judge Lancaster issued an Opinion of the Court which concerned the motions. Judge Lancaster handed down his final Judgment on June 26, 1991. In it he stated:
(1) Defendant's Counter-Claim is hereby dismissed, with prejudice.
(2) Defendant has breached his contract with the Plaintiff and as a consequence thereof, Plaintiff is entitled to judgment of and from the Defendant in the sum of $2,331.25 plus pre-judgment interest thereon in the amount of $901.63 for a total judgment of $3,232.88, said judgment to bear interest at the rate of 8% per annum until paid.
(3) Plaintiff's request for attorney's fees and punitive damages are denied.
(4) All court costs, be and the same hereby are, assessed against the Defendant.
Century 21 appealed to this Court exactly one month later. On August 9, 1991, Keys filed his Notice of Cross Appeal.

LAW
Under Smith v. Redd, 593 So.2d 989 (Miss. 1991), the standard of review of a chancellor's determination of the existence or non-existence of a partnership "is limited by the manifest error-substantial evidence rule, which is generally applicable when reviewing the findings of a trial judge sitting without a jury." Id. at 993. As this issue also concerns a chancellor's determination as to the existence of a partnership, the same standard of review applies.
The term "partnership" is defined by Miss. Code Ann. § 79-12-11(1) as "an association of two (2) or more persons to carry on as co-owners a business for profit." The guidelines for determining whether a partnership exists are found at Miss. Code Ann. § 79-12-13. This statute reads:
In determining whether a partnership exists, these rules shall apply:
(1) Except as provided by section 79-12-31 persons who are not partners as to each other are not partners as to third persons.
(2) Joint tenancy, tenancy in common, tenancy by the entireties, joint property, common property, or party ownership does not of itself establish a partnership, whether such co-owners do or do not share any profits made by the use of the property.
(3) The sharing of gross returns does not of itself establish a partnership, whether or not the persons sharing them have a joint or common right or interest in any property from which the returns are derived.
(4) The receipt by a person of a share of the profits of a business is prima facie evidence that he is a partner in the business, but no such inference shall be drawn if such profits were received in payment:
(a) As a debt by installments or otherwise,
(b) As wages of an employee or rent to a landlord,
(c) As an annuity to a widow or representative of a deceased partner,

*715 (d) As interest on a loan, though the amount of payment varies with the profits of the business,
(e) As a consideration for the sale of the goodwill of a business or other property by installments or otherwise.
(5) Operation of a mineral property under a joint operating agreement does not by itself establish a partnership.
Smith states that although the above statutes codify the common-law partnership rules, "the common law is still used to supplement the statute in determining when a partnership exists." 593 So.2d at 993. Smith also states that, "The three main questions that are considered in partnership determination are (1) the intent of the parties, (2) the control question, and (3) profit sharing." Id. at 994. Of these three factors, profit sharing appears to be the most important. Indeed, § 79-12-13(4) states that the "receipt by a person of a share of the profits of a business is prima facie evidence that he is a partner in the business... ." (Emphasis added.) Additionally, although the existence of an actual written partnership agreement certainly is quite probative and useful, it is not necessary. A partnership "may exist as an oral or written, express or implied agreement among its members." Carmichael v. Agur Realty Co., Inc., 574 So.2d 603 (Miss. 1990).
When one applies the law to the case at bar, it becomes apparent that there was sufficient evidence to support the chancellor's partnership finding. In regard to the intent of the parties, both Keys and Nichols testified at length about their plans to join together to develop Sweetbriar. Furthermore, many of the letters written over the course of the subdivision's development are also indicative of the parties' desire to be partners. Century 21 did introduce some evidence which put the intent of the parties into some dispute. Testimony by Vice, Gates, Hardy, and Bozeman that Keys told or implied to them that Sweetbriar was Nichols' project certainly casts a shadow on the putative partners' intent. Nonetheless, this shadow is not so thick as to block out all light. Stated differently, although the proof is not perfect, the finding of a partnership by the chancellor was not clearly erroneous due to a lack of evidence of intent.
The second of the Smith factors, that of control, is a little more difficult to apply in the case at bar. Aubrey Nichols quite obviously ran the Sweetbriar partnership, holding the land in his name, obtaining a loan with which to buy the land, registering restrictive covenants, selling the individual lots, and running the partnership's day-to-day operations. However, both Nichols and Keys testified that the partnership was intentionally set up so that Nichols would be in control. According to Nichols:
I told him [Keys] that I wanted to do it. I had developed a subdivision out in east Columbus and I enjoy those type things and I wanted to be involved in it. I wanted to handle the negotiations. I wanted to be the primary partner involved in the transaction... .
He further stated:
It was very important to me to develop this and to not have to worry about running Bob down or running a partner down. I wanted to develop it myself from the standpoint of handling the financial package, dealing with the bank and that type of thing.
Keys also testified that Nichols wanted to run the partnership and did not want to have to track him down for his signature.
Smith again provides useful guidance. Under Smith, control is indicative of the existence of a partnership. However, "Control by itself is not the exclusive indicator of partnership. `Partner-like control' may or may not be found depending upon the surrounding circumstances, because the circumstances will vary from relationship to relationship." 593 So.2d at 994. If Keys had played an active role in running the partnership, there would be less doubt about its existence. Nevertheless, his lack of control is not enough by itself to disprove partnership.
The one factor which is the most important in determining the existence of a partnership is profit sharing. According to § 79-12-13(4), "the receipt by a person of a share of *716 the profits of a business is prima facie evidence that he is a partner in the business ..." Smith also states that, "the sharing of profits is an essential element of partnership." 593 So.2d at 994. In the case at bar, evidence of profit sharing consisted primarily of identical entries in the Keys' and Nichols' tax returns and a check from Nichols to Keys which supposedly represented Keys' half interest in a CD jointly held in the name of Sweetbriar Development Company. Another indication that Keys and Nichols shared profits can be found in the fact that very similar subdivision lots were deeded to them free of charge during the course of Sweetbriar's development.
The evidence of profit sharing is not perfect. There are inconsistencies between the two sets of tax returns and the Sweetbriar CD check was sent after the case started. Nevertheless, the proof, although flawed, was great enough to support a finding by the chancellor that Keys and Nichols shared profits. It was further sufficient to make a prima facie case under § 79-12-13(4) that Keys was a member of a partnership with Nichols.
Finally, it must be noted that Century 21's claim that they were somehow ambushed by the existence of this partnership is fatuous. They were told of Keys' involvement in the Sweetbriar development in Keys' letter of May 16, 1990, and raised the possibility of the existence of the partnership in their initial complaint. Their assertion that they were not aware that the issue of partnership might be raised at the hearing has no merit. The chancellor's partnership finding clearly was not manifestly erroneous, and should be affirmed.
Century 21 has raised as an issue on appeal whether the chancellor erred as a matter of law in considering, before rejecting, Keys' partnership defense. The appellant complains here of a possible error by the lower court which ultimately worked upon it no harm. By so doing Century 21 appears to have forgotten the rule of Davis v. Singing River Electric Power Association, 501 So.2d 1128, 1131 (Miss. 1987): "No trial is free of error; however, to require reversal the error must be of such magnitude as to leave no doubt that the appellant was unduly prejudiced." This doctrine was also well voiced in Davis v. Agents Finance Corporation, 249 Miss. 839, 164 So.2d 449 (1964) (quoting 5A C.J.S. Appeal and Error § 1676, p. 677):
In the interest of the orderly administration of justice and for the avoidance of useless expense to litigants, it is a fundamental principle of appellate procedure which is universally recognized and applied that a party cannot assign as error that which is not prejudicial to him; and harmless error, that is, error as such, unaccompanied by prejudice or injury, is not ground for reversal.
There is no reversible error flowing from this issue because there is no harm to undo. As Century 21 was not prejudiced by this action of the lower court, any assignments of error based upon it should be disregarded.
Century 21 has also raised on appeal the issue of whether the chancellor erred as a matter of law in raising several affirmative defenses which were not set forth in any pleading, were not the subject of any testimony, or the subject of any argument made during the course of the trial. This issue actually encompasses several assignments of error related to the chancellor's interpretation of the 1985 contract between Century 21 and Keys. The first of these avers that Judge Lancaster should not have found parts of the contract to be ambiguous as Keys did not specifically plead that they were. The case of Barnett v. Getty Oil Company, 266 So.2d 581 (Miss. 1972), contains an excellent statement on to the proper use of the ambiguity doctrine:
Where the intentions of the parties to an instrument appear clear and unambiguous from the instrument itself, the court should look solely to the instrument and give same effect as written. If, however, a careful reading of the instrument reveals it to be less than clear, definite, explicit, harmonious in all its provisions, and free from ambiguity throughout, the court is obligated to pursue the intent of the parties, and, *717 to determine the intent, must resort to extrinsic aid.
Id. at 586.
When one considers when and how the doctrine of ambiguity is used, keeping the words of Barnett in mind, it becomes quite apparent that ambiguity is not a defense which one must affirmatively set forth. In a case such as the one at bar where the chancellor is asked to enforce a contract, the chancellor must first determine what the contract says. As Barnett demonstrates, if the language of the contract is plain and unambiguous, the chancellor must enforce it as written. However, if it is less than clear, the court must then attempt to ascertain the intent of the parties. As a chancellor must determine how clear a contract is before he can determine its meaning, whether a party raises a claim of ambiguity or not is in a very real sense irrelevant. This is what sets ambiguity apart from the affirmative defenses. The clarity of a contract must always be considered before a contract may be enforced, whereas the consideration of non-plead affirmative defenses is not required.
Hertz Commercial Leasing v. Morrison, 567 So.2d 832, 385 (Miss. 1990), looks at three particular contract affirmative defenses and provides a useful analysis of affirmative defenses in general:
As defenses to a contract action, failure of consideration, illegality and statute of frauds are similar. Each assumes the contract on its face entitles plaintiff to prevail but then reaches into the bag of rules prescribing forms and limiting the power of persons to contract and pulls one out, saying, "See, this contract may not be enforced." Each finds a rule of law external to the contract and brings it to bear to bar the plaintiff's action.
Ambiguity, however, is not a rule of law external to the contract. It is if anything internal, concerned with what the contract means and not with whether the contract should be enforced. Clearly, one cannot determine the enforceability of a contract until one first determines its meaning. Ambiguity analysis, unlike affirmative defense analysis, is by its very nature a necessary step in the examination of every contract. Ambiguity therefore does not need to be affirmatively pled by either party. Ambiguity analysis of the contract was not error.
The other assignments of error raised by Century 21 under this issue concern the actual finding of ambiguity by Judge Lancaster and the judge's subsequent interpretation of the contract. According to Century 21, the portions of the 1985 contract that Judge Lancaster found to be ambiguous, namely the first and third paragraphs, were straightforward and should be enforced as written. These paragraphs read:
There will be times when a salesperson desires to buy or sell property for his own account. When buying properties, the salesperson will obtain permission of the agency for this action. The agency has first refusal on the purchase and if the agency refuses, then the salesperson may buy the property for his own account. A full sales commission will be paid by the seller to the agency. It is important to advise the seller that the agent is buying for his own account. (Emphasis original.)
....
When the salesperson sells property that he owns, other than his homestead or personal residence, the commission fee to the agency will be waived on one sale annually. If there is more than one sale annually, the seller will pay the full commission to the agency. It is the intent of management to encourage sales associates to invest in real estate for their future. Accordingly, this waiver of commission shall apply to those properties that meet the IRS requirements and definitions of property held for investment. This means property must be held for a minimum of one (1) year prior to selling. Property that is sold within a period less than one (1) year, a full commission will be due to the agency.
Of these two paragraphs, the first is the less clear, particularly the clause concerning commission payments by the seller.[2] If the *718 fourth sentence of the first paragraph was enforced as written, the previous owners of the Sweetbriar property and not Bobby Keys would be the ones who owed Century 21 a commission. Note also that the last sentence of the first paragraph says that an agent is to tell a seller that he is buying for his own account but does not say that an agent must warn a seller of the commission. These two sentences read together might result in a seller owing the agency a commission of which the seller had never been informed.
Although this clause is a bit murky, its greatest flaw here is not its ambiguity so much as its inapplicability. There is nothing in it which would hold Keys liable to Century 21 based on the purchase of the Sweetbriar property. The only one who is to pay the agency on the purchase of the property under this clause is the seller. Indeed, the only duty for the agent that arises here is the duty to inform the seller that he is buying for his own account, a duty which Century 21 has never said Keys breached. Perhaps Century 21 intended for their agents to be secondarily liable for the commission if the seller did not pay. Perhaps they meant for the agents to be primarily liable. Nevertheless, if this is what they intended, it is not what they wrote. It is well established that, "[i]n contract construction cases our focus is upon the objective fact  the language of the contract. We are concerned with what the contracting parties have said to each other, not some secret thought of one not communicated to the other." Osborne v. Bullins, 549 So.2d 1337 (Miss. 1989).
The third paragraph, although hardly a model of clarity, cannot be said to be legally ambiguous. A single meaning of this paragraph can be ascertained if the paragraph is read as a whole. Simply restated, under this clause an agent must pay a commission on all property held for less than one year as such properties do not qualify as investment property under the IRS investment property requirements and definitions. A full commission must also be paid on all property sold after that first year, less one waived sale per year.
So interpreted, it is not difficult to fit this clause in with the rest of the contract. After determining that a commission is due on a sale, the next step is to determine what that commission is. To do this in the case at bar, one must turn to Policy G-1 which deals with commission fees and commission splits. The applicable part of Policy G-1 reads "On all lots, acreage and farms, the commission fee will be 10%, but not less than $1,000.00." Next, to determine how much of this commission goes to the agent and how much goes to the agency, one must turn to Policy G-3. Under this policy, the agent/agency split depends on the number of million-dollar producers. According to Vice, there were six such million-dollar producers at the relevant time. Policy G-3 dictates under the category "in-house sale and listing," that when there are six million-dollar producers, the agent gets 75% of the commission and the agency gets 25%. Therefore, Century 21 was entitled to 25% of 10% or 2.5% of Keys' sales.
The application of the contract to this case is made more difficult by the fact that Keys was not a titled owner of the land that he was selling. His only claim to ownership came from his partnership with Aubrey Nichols. Under this partnership, Keys held only a half interest in the Sweetbriar lots. This raises a question as to how much of the sale price Keys should pay a commission on. Although the contract does not specifically address this issue, Policy L-1 does say that it applies, "[w]hen a salesperson sells property that he owns ..." and does not say that it should apply to the total sales price. (Emphasis ours.) As Keys only owned half of each of the properties sold by the partnership it follows that he should only pay a commission on half of the sales price.
The Sweetbriar property was bought on July 31, 1985. Four lots were sold in late 1985, all for $35,000. As these lots were sold within less than a year after the property was purchased, they do not qualify *719 as investment property under Policy L-1. Therefore none of the sales of these lots are waived. When one takes 2.5% of half of the sale price, one gets a total commission of $1750.00 owed on these four properties. On February 3, 1986, Lot 2 was sold for $35,000. Although this was the only sale in 1986, as it took place less than a year after the Sweetbriar property was purchased by the partnership, the $437.50 commission on the sale is not waived. Four lots were sold in 1987  Lot 7 on March 11 for $35,000; Lot 9 on June 9 for $35,000; Lot 4 on June 18 for $27,500; and Lot 1 on November 9 for $19,000. After waiving the commission for the sale of Lot 7[3], the total amount of commissions for 1987 is $1018.75. As only one lot was sold in 1988, the commission on its sale is waived. Finally, because the relevant part of Policy G-3 only applies to an "in-house sale and listing," no commission is owed to Century 21 based on the non-compensated transferral of two lots to Keys. (Emphasis ours.) The grand total for all of the commissions owed to Century 21 for 1985-1988 is $3206.25. The portion of Judge Lancaster's opinion which holds otherwise is therefor reversed and rendered.
The 1985 version of Policy A-14 reads in pertinent part:
Those transactions which the terminating sales associate has initiated and are in the process of closing shall be assessed at 50% of the terminating sales associates commission for follow-up action by management in order to complete the transactions.
In 1986 Policy A-14 was revised. The new version of the above clause reads:
Those transactions which the terminating sales associate has initiated and are in the process of closing shall be paid to the sales associate based on 50% of the current CENTURY 21 DEEP SOUTH PROPERTIES commission schedule as outlined in the POLICY & PROCEDURE manual.
The key to both versions of this clause is the phrase "and are in the process of closing." Bob Keys left Century 21 in 1989 and the last Sweetbriar lot was sold in 1988. Therefore no Sweetbriar sales were in the process of closing when Keys terminated his relationship with the agency making Policy A-14 therefor inapplicable.
Finally, only one of Keys' cross-appeal issues bears mentioning: whether the chancellor erred in awarding prejudgment interest to plaintiff Century 21. "For prejudgment interest to be awarded, the party must make a proper demand for the interest in the pleadings, including the date that it was allegedly due." Wirtz v. Switzer, 586 So.2d 775, 785 (Miss. 1991). Furthermore, a general prayer for relief is not sufficient to authorize a trial court's award of such interest. West Center Apartments Limited v. Keyes, 371 So.2d 854 (Miss. 1979). Century 21 freely admits in their reply brief that they did not specifically request prejudgment interest in their original complaint. As no request for such interest was made, it was error for the lower court to grant Century 21 prejudgment interest. Therefore, the holding of the lower court so ruling is reversed and rendered.
There was ample evidence in the record to support Judge Lancaster's finding that a partnership to develop Sweetbriar subdivision existed between Bobby Keys and Aubrey Nichols. This finding is therefore affirmed. Furthermore, any assignments of error raised by Century 21 which flow from Judge Lancaster's consideration and rejection of Keys' § 73-35-3(5) partnership defense should be disregarded as Century 21 was in no way injured by this decision.
The first paragraph in Policy L-1 is inapplicable in the case at bar as it concerns the seller of the Sweetbriar property and not the purchaser Keys. The third paragraph of Policy L-1 is not legally ambiguous. The ruling of the lower court holding otherwise is *720 therefore reversed and rendered. After combining this clause with the rest of the contract and applying it to the facts of the case below, a grand total of $3,206.25 worth of commissions owed by Keys to Century 21 emerges. The ruling of the lower court holding otherwise is reversed and rendered. Also, as Policy A-14 of the contract is inapplicable to the case at bar, the ruling of the lower court so holding is affirmed.
In regard to the assignments of error raised by Keys, as Century 21 did not specifically request prejudgment interest they were not entitled to receive it. The ruling of the lower court holding otherwise is reversed and rendered.
AS TO DIRECT APPEAL: AFFIRMED IN PART; REVERSED AND RENDERED IN PART. AS TO CROSS-APPEAL: REVERSED AND RENDERED.
SULLIVAN, PITTMAN, BANKS, McRAE, JAMES L. ROBERTS, Jr., and SMITH, JJ., concur.
DAN M. LEE, P.J., concurs in result only.
PRATHER, P.J., not participating.
NOTES
[1] An examination of the 1983 and 1987 policies shows that the above passages are identical. Furthermore, Tommy Vice gave uncontroverted testimony that, for the purposes of this case, there was no change in the wording the policies.
[2] Although Keys apparently did not comply with the clause contained in the first paragraph dealing with Century 21's right of first refusal, Century 21 has not adequately raised this matter on appeal. It is briefly noted in regard to the partnership issue, but it is not well developed enough to be a true assignment of error.
[3] As Policy L-1 does not give guidance on which sale to waive where the various sales are of different values, a small contractual ambiguity arises. Because an ambiguity is to be construed more strongly against the party that prepared the contract, Kight v. Sheppard Building Supply, Inc, 537 So.2d 1355 (Miss. 1989) this ambiguity should be construed against Century 21. Therefore, one of the two 1987 sales which would produce the two largest agency commissions should be waived.