911 So.2d 975 (2005)
Clinton SUMMERS, Appellant
v.
A-1 CASH, INC. and Mickey Russell, Appellees.
No. 2004-CA-00188-COA.
Court of Appeals of Mississippi.
September 27, 2005.
*976 R. Andrew Foxworth, Columbia, attorney for appellant.
Ray T. Price, Hattiesburg, attorney for appellees.
Before BRIDGES, P.J., GRIFFIS and BARNES, JJ.
BARNES, J., for the Court.
¶ 1. Clinton Summers appeals the decision of the Marion County Chancery Court, challenging the court's finding that no partnership existed between him and Mickey Russell with regard to A-1 Cash, Inc., a check-cashing business. Finding no error, we affirm.

SUMMARY OF FACTS AND PROCEDURAL HISTORY
¶ 2. Clinton Summers and Mickey Russell met as business colleagues in 1989 and continued to work together as co-employees in a number of businesses until the spring of 1994. In April of 1994, Summers and Russell met to discuss a plan to open a check-cashing business in Columbia, Mississippi. Summers and his wife testified that, under the plan, Russell would fund the business while Summers would provide labor and day-to-day oversight of the business. Summers and his wife also stated that a verbal partnership agreement existed under which Summers and Russell *977 would split ownership of the business and all profits equally after Russell recouped his start-up capital of $20,000. Russell, however, testified that no partnership agreement existed, and that he merely offered Summers a position as an employee-manager of the proposed business. Both parties testified that under the plan, Summers was to be paid a salary of $400 per week until Russell recouped his initial investment, and that afterward Summers would receive a percentage of the profits. Summers said the agreement was that he would receive fifty percent of all profits; Russell stated that he offered Summers forty percent of the profits, but over time raised Summers's share to fifty percent.
¶ 3. Upon opening the business  named Cash Advance  in May of 1994, the parties established a bank account for the business at Magnolia Federal Bank (now Union Planters Bank) in the name of "Clinton Summers or Mickey Russell JTROS DBA Cash Advance." The style of the account indicated that the parties held the account as joint tenants with the right of survivorship. The tax identification number associated with the account was Summers's social security number. In addition, the parties established telephone and electricity services for the business; these accounts were opened in Summers's individual name. The business quickly became profitable, and by November of 1995 Russell had recouped his initial investment. From that point on, Summers received forty percent and then fifty percent of the business's profits.
¶ 4. The business's success spurred Russell and Summers to open locations in Brookhaven and McComb, and Summers's duties expanded to the oversight of all three branches. Summers and Russell split the profits from all three locations equally. On July 14, 1998, Russell formed a corporation known as A-1 Cash, Inc., naming himself as the sole officer and director, and issuing to himself all shares of stock in the corporation. The bank accounts were re-titled in the name of A-1 Cash, Inc., and a corporate bank account was established at Union Planters Bank to handle the business's day-to-day check-cashing operations. The signature cards for the corporate account indicated Summers and Russell as being co-owners of A-1 Cash. Another account was also opened at Union Planters Bank and titled in the name of "A-1 Cash, Mickey W. Russell and Clinton Summers." Profits from all three branches were deposited into this account, and after employee wages were deducted from the account, Russell and Summers shared the remainder of the money equally. Russell and Summers were both considered employees of A-1 Cash for income tax purposes, and both reported their income on IRS W-2 forms issued by A-1 Cash, Inc.
¶ 5. In March of 2000, Russell prepared a document entitled "Management Personnel." The document has the heading of "A-1 Cash, Inc.," and lists Russell as holding the positions of president, secretary and treasurer. Summers is listed as manager of the Columbia, McComb and Brookhaven locations. Both parties signed the document: Russell signed his name next to the word "owner," and Summers signed his name next to the word "manager." Additionally, documents from the business's workers' compensation insurance policy indicated that Russell was the president of the corporation and that Summers held the position of secretary. Neither Russell nor Summers was covered by the policy.
¶ 6. The business relationship between Summers and Russell continued until January of 2002, when Russell entered the Columbia location and asked Summers to leave. One month later, Summers filed a *978 complaint in the Marion County Chancery Court to dissolve the partnership and for an accounting. The court bifurcated the trial, first proceeding without a jury to determine whether a partnership existed between Summers and Russell, and, if so, when the partnership ceased to exist. Finding that the parties lacked sufficient intent to form a partnership, that Summers did not exercise sufficient control over the business to be considered a partner and that the profits distributed to Summers were actually wages, the chancellor held that a partnership did not exist between the parties with regard to Cash Advance and A-1 Cash, Inc. Aggrieved, Summers timely appealed to this Court.
¶ 7. On appeal, Summers claims that (1) the chancellor was manifestly wrong in his finding that there was no intent by Summers and Russell to form a partnership; (2) the chancellor was manifestly wrong in finding that Summers failed to exercise control over the business sufficient to indicate a partnership interest in the business; and (3) the chancellor was manifestly wrong in finding that profits from the business paid to Summers were in the form of wages and that thus Summers did not share in the losses and liabilities of the business. Finding that the chancellor applied the correct legal standards and that the evidence, while conflicting, supports the chancellor's determinations of fact, we affirm the lower court's ruling that no partnership existed between Russell and Summers.

STANDARD OF REVIEW
¶ 8. "In reviewing the factual findings of a chancellor sitting without a jury, we apply the substantial evidence standard. We will not disturb those findings which are supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous, or applied an erroneous legal standard." Mississippi Gaming Comm'n v. Imperial Palace of Mississippi, Inc., 751 So.2d 1025, 1027 (¶ 8) (Miss.1999) (citing Church of God Pentecostal, Inc. v. Freewill Pentecostal Church of God, Inc., 716 So.2d 200, 204 (¶ 15) (Miss.1998)).

ANALYSIS
¶ 9. Section 79-12-11 of the Mississippi Code defines "partnership" as "an association of two (2) or more persons to carry on as co-owners a business for profit...." Miss.Code Ann. § 79-12-11 (Rev.2001). Additionally, section 79-12-13 sets forth the guidelines for determining whether a partnership exists. It reads:
In determining whether a partnership exists, these rules shall apply:
(1) Except as provided by section 79-12-31 persons who are not partners as to each other are not partners as to third persons.
(2) Joint tenancy, tenancy in common, tenancy by the entireties, joint property, common property, or party ownership does not of itself establish a partnership, whether such co-owners do or do not share any profits made by the use of the property.
(3) The sharing of gross returns does not of itself establish a partnership, whether or not the persons sharing them have a joint or common right or interest in any property from which the returns are derived.
(4) The receipt by a person of a share of the profits of a business is prima facie evidence that he is a partner in the business, but no such inference shall be drawn if such profits were received in payment:
(a) As a debt by installments or otherwise,
(b) As wages of an employee or rent to a landlord,

*979 (c) As an annuity to a widow or representative of a deceased partner,
(d) As interest on a loan, though the amount of payment varies with the profits of the business,
(e) As a consideration for the sale of the goodwill of a business or other property by installments or otherwise.
(5) Operation of a mineral property under a joint operating agreement does not of itself establish a partnership.
Miss.Code Ann. § 79-12-13 (Rev.2001).
¶ 10. While these statutes codify the common law rules of partnership, "[T]he common law is still used to supplement the statute in determining when a partnership exists." Smith v. Redd, 593 So.2d 989, 993 (Miss.1991). Although the existence of a written partnership agreement is useful, it is not necessary. Century 21 Deep South Properties, Ltd. v. Keys, 652 So.2d 707, 715 (Miss.1995). "A partnership `may exist as an oral or written, express or implied agreement among its members.'" Id. (quoting Carmichael v. Agur Realty Co., 574 So.2d 603, 610 (Miss.1990)).
¶ 11. The Mississippi Supreme Court held in Smith that the three main questions that must be considered in partnership determination are (1) the intent of the parties, (2) participation in the control of the business and (3) profit sharing. Smith, 593 So.2d at 994. While the intent and control questions are important, profit sharing is the most important factor. Century 21, 652 So.2d at 715. In fact, section 79-12-13(4) of the Mississippi Code provides that "receipt by a person of a share of the profits of a business is prima facie evidence that he is a partner in the business." Miss.Code Ann. § 79-12-13(4) (Rev.2001). Notably, however, section 79-12-13(4)(b) prohibits the inference of partnership when the profits shared are characterized as wages of an employee.

A. Intent
¶ 12. Because there was no written partnership agreement between the parties, the chancellor looked to the surrounding circumstances in determining whether the parties intended to enter into a partnership. See Smith, 593 So.2d at 994. The chancellor was confronted with conflicting testimony as to whether Russell and Summers intended to enter into a partnership with regard to Cash Advance and, later, A-1 Cash, Inc. The lower court noted that while there were some documents in evidence purporting to list Summers as a co-owner of the business, "[T]here was conflicting testimony as to who actually prepared the documents, who provided the information, and who physically filled out portions of the documents." The chancellor took special note of the "Management Personnel" form featuring Russell's signature above the word "owner" and Summers's signature above the word "manager" in determining that the parties had intended Summers to be an employee of the business rather than a partner.
¶ 13. In attempting to show that the parties had the requisite intent to form a partnership, Summers relies heavily on the fact that the business's original bank account was titled in the name of Russell and Summers as joint tenants with the right of survivorship. While this fact was clearly entitled to some consideration by the chancellor, it does not resolve the question of intent. Section 79-12-13(2) of the Mississippi Code states that joint tenancy "does not of itself establish a partnership, whether such co-owners do or do not share any profits made by the use of the property." Miss.Code Ann. § 79-12-13(2) (Rev.2001). Summers concedes that the chancellor was not required to find that *980 the parties intended to create a partnership solely because the business's bank account was held in joint tenancy; however, he suggests that "a significant amount of imagination would be required to believe that a sole proprietor, as Russell claims himself to be, would title the only asset of his business in such a manner if he intended anything other than a partnership." While that may be the case, when substantial evidence supports a chancellor's findings, we will not disturb his conclusions, even if we might have found otherwise as an original matter. See Murphy v. Murphy, 631 So.2d 812, 815 (Miss.1994). There was sufficient evidence before the chancellor to cast doubt on Summers's claim of partnership; thus we must affirm the chancellor's findings.
¶ 14. The chancellor's final judgment also noted that Russell and Summers had formerly been partners in a business known as "Mac's Titles for Cash." The chancellor stated in his judgment that "It is undisputed among the two that this was intended to be a partnership, and was evidenced in a formal partnership agreement that had been drafted and properly executed." The chancellor reasoned that in light of the parties' past behavior, the lack of such a writing in the case of the Cash Advance business militated against the finding of a partnership. While the chancellor's reasoning would have been sound had this alleged written agreement been introduced into evidence, no evidence of the prior partnership agreement appears in the record. Neither party submitted the agreement into evidence, and the only testimony elicited on the matter showed that the partnership agreement between Russell and Summers in the Mac's Titles for Cash business had been verbal in nature. Notwithstanding the chancellor's mistake, however, the court still had before it sufficient evidence to find that no intent to create a partnership existed between Russell and Summers. Accordingly, the chancellor's finding of no intent was not clearly erroneous.

B. Control
¶ 15. While control is indicative of the existence of a partnership, "Control by itself is not the exclusive indicator of partnership. `Partner-like control' may or may not be found depending on the surrounding circumstances, because the circumstances will vary from relationship to relationship." Century 21, 652 So.2d at 715 (quoting Smith, 593 So.2d at 994). In the instant case, the chancellor found that Summers failed to exercise sufficient control over the business to be considered a partner. In so finding, the court noted that there was no testimony showing any particular incident where Summers exercised authority over business decisions.
¶ 16. The evidence before the chancellor showed that on one particular occasion when Summers filed suit against the Marion County Sheriff on behalf of the business, Russell became furious and forced Summers to drop the suit. Furthermore, testimony from former A-1 Cash employees Lisa Walker and Susan Prine shows that Summers admitted to them that he was only a manager of the business, not the owner. Similarly, Ricky Myers, president of a state check cashers' association, testified that Summers told him he could not attend a convention because Russell was "tight" with the business's money. Lastly, Summers's own testimony belies his contention that he exercised control over the business. When asked whether he did whatever Russell commanded, Summers said, "If he told me something I needed to do I did it." However, when asked whether Russell would follow Summers's orders, Summers responded "I doubt it. He did what he wanted to." While it was shown that Summers exercised *981 some control over the business in conjunction with Russell, it is unclear from the record that his actions were inconsistent with being an employee-manager of the business. The record is replete with evidence that contradicts Summers's claims that he exercised control over the business; thus, we affirm the chancellor's finding.

C. Profit sharing
¶ 17. The Mississippi Supreme Court stated in Smith that "one of the main indicators of a partnership is the right of a party to share profits and losses." Smith, 593 So.2d at 994. The court took the analysis further in Century 21, holding that profit sharing was the most important factor in the Smith analysis. Century 21, 652 So.2d at 715. Additionally, under section 79-12-13(4)(b) of the Mississippi Code, "receipt by a person of a share of the profits of a business is prima facie evidence that he is a partner in the business." Miss.Code Ann. § 79-12-13(4)(b) (Rev.2001). However, this inference is destroyed if the profits shared are characterized as wages. See Miss.Code Ann. § 79-12-13(4)(b) (Rev.2001). The chancellor found that Summers received his share of profits in the form of wages, and that as a result he did not share in the business's profits in accordance with Smith. Summers contends that the chancellor erred in characterizing his earnings as wages and in finding that he did not share in the business's profits and losses.
¶ 18. It was undisputed at trial that Summers and Russell split the profits from Cash Advance and, later, A-1 Cash, Inc. While Summers testified that he received his half of the business's profits in the capacity of partner, Russell testified that he hired Summers as an employee-manager of the business, offering him a share of the profits in order to give him an incentive to work diligently. Russell testified that he had structured a similar plan for an employee at another one of his check-cashing businesses; that employee, Russell testified, received forty percent of the business's profits in return for her service as an employee-manager.
¶ 19. In arguing that he was in fact a partner, Summers relies heavily on the fact that he was excluded from A-1 Cash's workers' compensation policy. Section 71-3-5 of the Mississippi Code provides in pertinent part:
Any employer may elect ... to be exempt from the provisions of the Workers' Compensation Law as to its sole proprietor, its partner in a partnership or to its employee who is the owner of fifteen percent (15%) or more of its stock in a corporation, if such sole proprietor, partner or employee also voluntarily agrees thereto in writing.
Miss.Code Ann. § 71-3-5 (Rev.2000).
¶ 20. Summers voluntarily waived coverage under A-1 Cash's workers' compensation policy in order to increase the business's profits. He asserts that under section 71-3-5, he could not have waived coverage were he not a partner alongside Russell. Further, he argues that Russell should not be able to "have his cake and eat it too," claiming that Russell should not be able to disclaim him as a partner while reaping significant savings on policy premiums. However, we refuse to conflate partnership law with the law of workers' compensation. While the chancellor rightly could have considered that Summers's waiver of coverage militated in favor of a finding of partnership, the chancellor was not bound to find a partnership merely because Summers waived such coverage. There was substantial evidence before the chancellor suggesting that Summers's share of the business's profits was in the form of wages, and thus we must affirm his finding.

*982 CONCLUSION
¶ 21. The chancellor had substantial evidence before him suggesting that Summers and Russell never intended to enter into a partnership, that Summers exercised little control over Cash Advance or A-1 Checking and that Summers's share of the business's profits was in the form of wages. While this Court might have found otherwise as an original matter, we cannot say that the chancellor's findings were manifestly wrong. Thus, we must affirm.
¶ 22. THE JUDGMENT OF THE CHANCERY COURT OF MARION COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., BRIDGES AND LEE, P.JJ., IRVING, MYERS, CHANDLER, GRIFFIS AND ISHEE, JJ., CONCUR.