## IN THE SUPREME COURT OF MISSISSIPPI

### NO. 98-KA-00226-SCT

*EDISON DIZON a/k/a EDISON DAVID DIZON*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/26/1997 |
| TRIAL JUDGE: | HON. KATHY KING JACKSON |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | RICHARD C. CONANT |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: DEWITT T. ALLRED, III |
| DISTRICT ATTORNEY: | DALE HARKEY |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 11/18/1999 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 12/09/99 |

## EN BANC

## PITTMAN, PRESIDING JUSTICE, FOR THE COURT:

### STATEMENT OF THE CASE

¶1. This is an appeal from the Circuit Court of Jackson County, Mississippi, where, on February 25, 1997, appellant Edison Dizon ("Dizon") was convicted of the murder of Lino Rodriguez ("Rodriguez").

### STATEMENT OF FACTS

¶2. On June 26, 1996, Dizon and Randy Tesoro were indicted for the murder of Rodriguez. The indictment charged the two with willfully, feloniously and without the authority of law killing and murdering Rodriguez with deliberate design to effect Rodriguez's death.

¶3. A jury trial was held in Jackson County Circuit Court on February 24 and 25, 1997. Testimony at trial established that on the evening of April 20, 1996, Dizon, Dizon's two daughters, Tesoro, Tesoro's son, and Rhonda Cruise ("Cruise") drove to the Monico Lake Apartments in Pascagoula to deliver Dizon's two young daughters to Gwendolyn Eason ("Eason"), Dizon's long-time girlfriend and the girls' mother.

¶4. When Dizon discovered Eason was not in the apartment, he pulled an aluminum baseball bat from a closet inside the apartment and went to Rodriguez's apartment in search of Eason. Eason had earlier admitted having a sexual relationship with Rodriguez.

¶5. Dizon knocked on Rodriguez's door. When Eason answered the door, Dizon bit her on the shoulder. Eason ran to the apartment of a neighbor, Renatta Dupree, and asked her to call the police.

¶6. A scuffle ensued that involved Dizon, Tesoro, and Rodriguez, with Tesoro apparently attempting to break up the confrontation. The scuffle moved to the lawn in front of the apartment building. Dizon struck Rodriguez numerous times with the baseball bat, knocking him to his knees. Dizon then turned and chased Eason, cursing her. Dizon returned to where Rodriguez was kneeling on the ground and struck him again with the baseball bat. Following this final attack, Dizon got into the car driven by Tesoro and fled. A short distance from the scene, Dizon threw the baseball bat from the car. Rodriguez was transported to Singing River Hospital in Pascagoula. He died two days later, never having regained consciousness.

¶7. At trial, the only defense presented was by Tesoro. Tesoro made a Motion for a Directed for Verdict for Acquittal which was granted by the trial court. The jury subsequently returned a verdict convicting Dizon of murder. The trial judge immediately sentenced Dizon to life in the custody of the Mississippi Department of Corrections.

¶8. Dizon filed a Motion for a New Trial or in the Alternative, J.N.O.V., and a hearing was held on the matter. The trial court subsequently denied the motion. The trial court then granted a motion by Dizon's trial counsel to withdraw and appointed new counsel.

¶9. Dizon, alleging that he had been denied his constitutional right to testify on his own behalf, filed an Extraordinary Motion for New Trial. The trial court dismissed the motion without prejudice, stating that it was without jurisdiction to hear the motion because Dizon had already filed a direct appeal with this Court.

¶10. Dizon then petitioned this Court for Extraordinary Relief under M.R.A.P. 21. This Court considered the motion as a motion to supplement the record under M.R.A.P. 10(e) and remanded to the trial court for an evidentiary hearing on the issue of whether Dizon had been properly informed of and advised of his right to testify on his own behalf, and whether he had effectively waived that right under *Culberson v. State*, 412 So.2d 1184 (Miss. 1982).

## STATEMENT OF ISSUES

**I. WHETHER DIZON WAS DENIED HIS CONSTITUTIONAL RIGHT TO TESTIFY IN HIS OWN BEHALF AT TRIAL BY HIS ATTORNEY AND THE TRIAL COURT.**

**II. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE STATE TO SUBMIT JURY INSTRUCTIONS IN VIOLATION OF THE DICTATES OF RULE 3.07, UCCCR, RESULTING IN ACTUAL PREJUDICE TO DIZON AT TRIAL.**

**III. WHETHER THE TRIAL COURT ERRED IN ALLOWING JURY INSTRUCTION S-2A TO BE GIVEN TO THE JURY WHICH, IN EFFECT, MATERIALLY AMENDED DIZON'S INDICTMENT.**

**IV. WHETHER THE TRIAL COURT ERRED IN SUBMITTING JURY INSTRUCTION S-2A TO THE JURY WHICH WAS AN INACCURATE STATEMENT OF THE LAW, WHICH CONTAINED AN ESSENTIAL ELEMENT FOR WHICH NO EVIDENCE WAS PRESENTED BY THE STATE, WHICH WAS PREJUDICIAL TO DIZON, AND WHICH WAS UNCONSTITUTIONALLY VAGUE AND CONFUSING TO THE JURY'S**

DELIBERATIONS.

**V. WHETHER THE TRIAL COURT ERRED IN SUBMITTING JURY INSTRUCTION S-2A TO THE JURY WHICH WAS IN HOPELESS CONFLICT WITH JURY INSTRUCTION S-7 AND CONFUSING TO THE JURY'S DELIBERATIONS.**

**VI. WHETHER DIZON RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL.**

## STANDARD OF REVIEW

¶11. As this Court has repeatedly stated, "[n]o trial is free of error; however, to require reversal the error must be of such magnitude as to leave no doubt that the appellant was unduly prejudiced." *Century 21 Deep South Properties, Ltd. v. Keys*, 652 So.2d 707, 716 (Miss. 1995) (quoting *Davis v. Singing River Elec. Power Ass'n*, 501 So.2d 1128, 1131 (Miss. 1987)).

## DISCUSSION OF LAW

### I. WHETHER DIZON WAS DENIED HIS CONSTITUTIONAL RIGHT TO TESTIFY IN HIS OWN BEHALF AT TRIAL BY HIS ATTORNEY AND THE TRIAL COURT.

¶12. Dizon argues that he was denied his constitutional right to testify on his own behalf at his trial. Dizon first filed a petition with this Court seeking relief under M.R.A.P. 21. This Court considered the petition as a motion to supplement the record under M.R.A.P. 10(e) and remanded the matter to the trial court for an evidentiary hearing on the matter as suggested by *Culberson v. State*, 412 So.2d 1184 (Miss. 1982). This Court specifically limited the hearing to whether Dizon was properly informed of and advised of his right to testify on his own behalf and whether Dizon effectively waived that right. The evidentiary hearing was subsequently held with the transcript of the hearing being filed with this Court as a supplemental volume of the record.

¶13. After careful review, we find that Dizon was not fully advised of his right to testify on his own behalf. This being the case, Dizon's constitutional rights have been violated, and this case must be reversed and remanded for a new trial.

¶14. As this Court stated in *Culberson*, if an accused is denied the right to testify on his own behalf, it is a constitutional violation regardless of whether the denial is a result of a refusal by the court or a refusal by the accused's counsel to allow the accused to testify. *Culberson*, 412 So.2d at 1186. The Court went on to suggest that if the defendant does not testify, the trial judge should, outside the presence of the jury, advise the defendant of the right to testify. *Id.* If the defendant wishes to testify, he should be allowed to do so. If the defendant does not wish to testify, he will not be required to testify. *Id.*

¶15. Dizon argues that he did not understand that he had a right to testify, nor did he knowingly waive such right. As support, Dizon cites his lack of expertise in the criminal justice system. Dizon also argues that his attorney's ambiguous question regarding his willingness to testify, that was asked of him after the State rested, clearly shows that Dizon did not know he had the right to testify on his behalf. It necessarily follows that he could not effectively waive that which he did not know he had. Further, there is no colloquy between the court and Dizon regarding Dizon testifying.

¶16. At the evidentiary hearing, Dizon's trial counsel testified that he had talked with Dizon regarding what his testimony would be if he testified at trial. He testified that he could **not** definitively say that he had advised Dizon that he had a **right** to testify. After the State rested, trial counsel met with Dizon in a holding cell and discussed Dizon's family and military record and what he would testify to if put on the stand. Trial counsel stated:

> And then, I think we just probably left it up in the air or either he decided that he was going to testify. I'm not sure which it was. But we came back up here and began the trial again. And I leaned over to him and I said, **Well, are you ready to do this? And he said no.** So, I assumed from that, he'd changed his mind about testifying or made up his mind about whether he was going to testify or not. And so we rested at that point.

¶17. Trial counsel testified he had no doubt that Dizon had voluntarily waived his right to testify at the trial at the time the defense rested. However, he did testify that in hindsight, "the sloppiness of [his] question" may have caused a miscommunication between Dizon and himself.

¶18. Dizon definitively testified that he was never informed of his right to testify by trial counsel. He testified that he spoke with his trial counsel a "couple of times" before trial and repeatedly told him that he wanted to testify. According to Dizon, trial counsel never prepped him to testify.

¶19. Interestingly enough, the dissent argues that we rely on disputed testimony between Dizon and his trial counsel in reaching our conclusion that Dizon was denied his right to testify. At the hearing, Dizon's trial counsel testified that he could not say with certainty that he ever advised Dizon of his right to testify. Dizon then testifies that trial counsel did not tell him he had a right to testify. Where is the dispute?

¶20. Dizon cites his inexperience with the criminal justice system as his reason for not questioning trial counsel's conduct of resting without calling him to testify. When asked why he did not attempt to communicate with his trial counsel when trial counsel rested, Dizon stated that he was surprised by trial counsel's actions. Dizon testified that he did not learn he had a right to testify until he was incarcerated after the conviction.

¶21. The dissent suggests that this is "one of those extraordinary cases where the record clearly demonstrates that Dizon was not denied his right to testify." Dissent at page 2. The dissent is incorrect: this is a case where the record does clearly show that Dizon was denied his right to testify. When trial counsel states on oath that he is not sure that Dizon clearly understood he had a right to testify, no other conclusion can be reach except that such right was denied.

¶22. The judge was put on notice that Dizon wanted to testify. During opening statements, trial counsel told the jury that Dizon was not going to get on the witness stand and deny what happened. In fact, he would testify about what did actually happen when Rodriguez was beaten.

¶23. While there is no doubt that Dizon committed the act that led to Rodriguez's death, there is no way to know if the jury would have been swayed by Dizon's testimony. Dizon argues that had he been allowed to testify, he would have told the "whole story." Without knowing what the "whole story" is according to Dizon, this Court has no way of deciding if his testimony would have been persuasive. Dizon states he would have testified about his family life, his Navy career, and the fact that he had never been in trouble with the law.

¶24. The dissent argues that even if Dizon had testified, there is nothing that would have changed the verdict. How can we possibly know unless Dizon testifies? There may very well have been underlying factors only known to Dizon and Rodriguez that could have fueled the incident. The dissent states that there is nothing in the record to indicate that this could have possibly been manslaughter. Again, how could we possibly know this without hearing Dizon's side of the story? The issue in this case is not whether this incident involved heat of passion manslaughter. The issue is whether Dizon knew had a right to testify on his own behalf and whether he was afforded that right.

¶25. This Court suggested in *Culberson* that the trial judge question the defendant outside the presence of the jury regarding the defendant's right to testify on his own behalf. *Culberson*, 412 So.2d at 1186. From review of the record, it seems that this would have been the most prudent course of action for the judge to take. Trial counsel stated during opening statements that Dizon would testify. This in itself should have been enough to trigger an inquiry by the judge as to whether or not it had been explained to Dizon that he had a constitutional right to testify and whether or not he had waived that right.

¶26. The dissent argues that we have today created "a hard and fast due process procedural right which must be complied with in each case." *Dissent at page 1*. Such is not the case. We find that the judge was on notice that Dizon wanted to testify. The judge should have erred on the side of caution and questioned Dizon according to *Culberson.* In fact, the dissent even agrees that it "would have been a better practice for the trial judge to follow the suggestion in Culberson and question Dizon then and there about his decision not to testify." *Dissent at page 3.*

## CONCLUSION

¶27. Because Dizon was denied his constitutional right to testify on his own behalf, we reverse the judgment of the Jackson County Circuit Court and remand this case to the trial court for a new trial. Because of our reversal on Issue I, we need not address Dizon's further assignments of error.

¶28. **REVERSED AND REMANDED.**

**PRATHER, C.J., SULLIVAN, P.J., BANKS, McRAE AND WALLER, JJ., CONCUR. SMITH, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY MILLS AND COBB, JJ.**

**SMITH, JUSTICE, DISSENTING:**

¶29. This Court previously remanded the issue of whether Dizon was denied his right to testify back to the trial court for an evidentiary hearing to supplement the record as this Court could not determine from the prior existing record whether Dizon waived his right to testify. The majority now determines that in fact Dizon was denied his constitutional right to testify. I disagree and accordingly dissent.

¶30. It is true that this Court suggested in *Culberson v. State*, 412 So. 2d 1184, 1186-87 (Miss. 1982), that in any case where a defendant does not testify, prior to the case going to the jury, trial courts should advise criminal defendants, out of the presence of the jury, but on the record, of their right to testify. Relying on disputed testimony between Dizon and his trial counsel, the majority here has now created a suggestion in *Culberson* into a hard and fast due process procedural right which must be complied with in each case.

¶31. Examination of this record and particularly Dizon's actions and inactions indicate that Dizon was fully aware of his right to testify. Dizon has, in fact, challenged the competency of his trial counsel which he claims was ineffective. This, of course, brings into issue the *Strickland* doctrine requiring a two-prong showing of deficient performance by counsel and prejudice. *Strickland v. Washington*, 466 U.S. 668, 687, 104 U.S. 2052, 2064, 80 L.Ed. 674 (1984). Dizon contends that he wanted to testify and would have done so had he only known that he had a legal right to do so. Dizon claims to have been totally unfamiliar with court procedure and simply unaware of his right to testify.

¶32. While *Culberson* may assist in ferreting out many cases which would otherwise be before this Court on this very issue, there are cases in which, upon review of the totality of evidence in the record, the Court can positively determine whether a defendant was denied his constitutional right to testify. The case at bar is one of those extraordinary cases where the record clearly demonstrates that Dizon was not denied his right to testify. In fact, the record reveals that Dizon knew that he had the right to testify, but waived that right by keeping silent regarding his desire to testify when he should have spoken up on the issue. Examination of the record is helpful in determining exactly what, in fact, occurred here. During voir dire, Dizon's counsel advised the court and jury that Dizon was going to testify. During argument on the motion of sever, Dizon's co-defendant's counsel advised the court that his client "insists on testifying during this trial." Dizon was present during this entire argument. In opening statements, Dizon's counsel again told the court and jury, "And he'll[Dizon] testify about what happened, about how he felt, about what went on inside him at that time." Finally, Dizon was present during trial and saw co-defendant Tesoro take the stand and testify. Considering all of these facts, it is hard to imagine that Dizon did not and could not comprehend that he not only had the right to testify, but that he had clearly discussed with his defense counsel in advance of trial and had agreed that he would testify. However, when counsel asked if he was ready, Dizon said no, perhaps as an afterthought having watched co-defendant Tesoro expose himself to cross-examination. Regardless, his counsel rested without offering any evidence. Supposedly "amazed, stunned, and in shock" at his lawyer's resting without allowing him to testify, in fact, Dizon never said one word to the court about testifying. Admittedly, it would have been a better practice for the trial judge to follow the suggestion in *Culberson* and question Dizon then and there about his decision not to testify. However, that does not change the fact that the numerous facts and events set out in this record demonstrate that Dizon absolutely knew he had the right to testify, but rather, when asked if he was ready to proceed, elected not to do so. And, the discussion does not end there.

¶33. Subsequent to the reading of the jury's verdict, the trial judge addressed Dizon, informing him that he would be sentenced to life imprisonment. Again, a golden opportunity for Dizon to tell the trial judge about what he now claims was his counsel's ineffective assistance. Dizon once more remained mute on the subject of testifying at trial. There was no indication at trial or at sentencing where the trial court, or for that matter Dizon's lawyer, could have concluded that Dizon did not know he could testify and that, in spite of his lawyer resting his case, Dizon in fact did want to and expected to testify. Not only is there an experienced trial judge that heard this case, but Dizon's lawyer is the public defender of Jackson County with years of experience representing defendants in criminal cases. He expected Dizon to testify, had discussed the same with him, and had announced repeatedly to the court and jury that Dizon would testify. When the moment arrived, Dizon said no.

¶34. Defense counsel was competent. Certainly he was not ineffective. There is a presumption of competence in favor of counsel, and Dizon did not overcome that presumption. *Foster v. State*, 716 So. 2d 538, 541 (Miss. 1998). There is no showing of deficient performance by defense counsel, nor is there

any showing of prejudice. Even had Dizon testified, there is nothing which indicates that the outcome of the verdict would have been different. The testimony showed that Dizon was angry and upset about his cheating girlfriend, Eason. He armed himself in advance and went looking for Eason and the victim, Rodriquez. He viciously beat the Rodriquez about the head with a metal baseball bat and left him lying on the ground while he chased after the girlfriend. He then returned a second time and struck the Rodriquez again with the bat. Rodriquez never regained consciousness and died two days later in the hospital.

¶35. Dizon's suggestion of justifiable homicide or self-defense is impossible to imagine considering these facts. His theory of justified, heat of passion manslaughter is equally inapplicable. Dizon argues that his discovery of Eason in Rodriguez's apartment led him to believe they were having an intimate encounter, and that his subsequent killing of Rodriguez was the result of a heat of passion. The evidence in this case simply does not support a finding of heat of passion manslaughter.

¶36. Heat of passion has been defined by this Court as:

> [A] state of violent and uncontrollable rage engendered by a blow or certain other provocation given. . . . Passion or anger suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at the time. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror.

*Tait v. State*, 669 So.2d 85, 89 (Miss.1996) (quoting **Buchanan v. State**, 567 So.2d 194, 197 (Miss.1990)). While no doubt there was an abundance of heat and passion in this slaying, it was preceded by plan and deliberation. This is not a situation in which Dizon, upon entering Eason's apartment, unexpectedly came across Eason and Rodriguez engaged in an intimate encounter. In fact, Dizon apparently already knew of the sexual relationship between Eason and Rodriguez, Eason having earlier admitted the relationship. Upon not finding Eason at her apartment on the day in question, Dizon armed himself with an aluminum baseball bat. Significantly, upon arming himself with the baseball bat, Dizon apparently had nothing more than a suspicion that Eason was in Rodriguez's apartment. At the time he armed himself, he had not even discovered Eason in Rodriguez' s apartment, much less found them engaged in an intimate encounter.

¶37. This Court has stated, "A deliberate design to kill a person may be formed very quickly, and perhaps only moments before the act of consummating the intent." *Catchings v. State*, 684 So. 2d 591, 595 (Miss. 1996). This Court has explained, "Although our law has never prescribed any particular ex ante time requirement, the essence of the required intent is that the accused must have had some appreciable time for reflection and consideration before pulling the trigger." *Williams v. State*, 729 So.2d 1181, 1185 (Miss. 1998). This Court has repeatedly held that the facts of a case in which the defendant arms himself prior to an encounter with the victim and in preparation for an encounter with the victim will not support a heat of passion defense. *See, e.g.*, *Miller v. State*, 740 So.2d 858 (Miss.1999) (spurned suitor carried gun to meeting with girlfriend then shot her when she rejected him); *Stevenson v. State*, 733 So. 2d 177 (Miss. 1998) (prisoner stole and secreted butcher's knife for later altercation with guard); *Greenlee v. State*, 725 So. 2d 816 (Miss. 1998) (son, after argument with his mother, returned from back of house with gun); **Barnett v. State**, 563 So. 2d 1377 (Miss. 1990) (defendant, in response to victim's challenge to fight, retrieved rifle from trailer home, returned and shot the victim).

¶38. Clearly, though Dizon was certainly "heated" when he retrieved the baseball bat from Eason's apartment, went searching for Eason and Rodriguez, and ultimately beat Rodriguez to death, the evidence in

this case simply could not support a finding of heat of passion manslaughter. The ultimate outcome would not have been altered even if Dizon had testified. Dizon cannot meet either prong of the *Strickland* test. In this extraordinary case, I would affirm the trial court.

¶39. For these reasons, I respectfully dissent.

**MILLS AND COBB, JJ., JOIN THIS OPINION.**