# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-KA-00560-COA

**BOBBIE JENKINS A/K/A BOBBIE LEWIS JENKINS, JR.**                    APPELLANT

**v.**

**STATE OF MISSISSIPPI**                    APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 08/28/2017 |
| TRIAL JUDGE: | HON. WILLIAM A. GOWAN JR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: HUNTER NOLAN AIKENS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ALICIA MARIE AINSWORTH |
| DISTRICT ATTORNEY: | ROBERT SHULER SMITH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 11/19/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE CARLTON, P.J., WESTBROOKS AND C. WILSON, JJ.

### WESTBROOKS, J., FOR THE COURT:

¶1. Bobbie Lewis Jenkins appeals his conviction for second-degree murder. His appointed counsel argues that the Hinds County Circuit Court erred when it (1) gave an incomplete instruction on accomplice culpability; (2) did not allow Jenkins's trial counsel to impeach an eyewitness with a picture after he testified that he was unfamiliar with firearms; and (3) allowed a law-enforcement officer to testify that Jenkins did not give a statement. In a pro se supplemental brief, Jenkins argues that he was deprived of (4) his statutory right to a speedy trial; and (5) his constitutional right to testify. After careful

review, we find no reversible error. Consequently, we affirm the circuit court's judgment.

## FACTS AND PROCEDURAL HISTORY

¶2. Jenkins's conviction stems from events that occurred on October 21, 2014, at the Cypress Point Apartments in Jackson, Mississippi. Responding to a report of a shooting, emergency responders found Moyanna Johnson's body on the floor of his apartment. He had been shot twice in the chest. The resulting investigation immediately pointed toward Jenkins. Although he turned himself in the following morning, he chose not to give a statement. Two eyewitnesses later gave statements implicating Jenkins. They also identified him from photo lineups.

¶3. In January 2015, Jenkins was indicted and charged with first-degree murder. After Jenkins was allowed to bond out of jail, his attorney filed six successful motions to continue the trial. The circuit court also granted two joint motions for continuances. His three-day trial finally began on July 24, 2017.

¶4. The prosecution called seven witnesses during its case-in-chief, which was bookended by two eyewitnesses. For the most part, eyewitnesses Marcus Collins and Jeremy Wilson provided consistent testimonies. They both said that Jenkins went to Johnson's apartment and asked a question.[1] Collins said that Jenkins and Johnson eventually began to argue, but Wilson said otherwise. Notwithstanding that discrepancy, they both testified that Jenkins

_____

[1] Collins testified that Jenkins asked whether "someone [went] to [his] house and st[ole] a pistol." Wilson said that Jenkins asked, "[W]hich one of y'all came to the apartment . . . looking for me[?]"

2

was standing outside of Johnson's apartment when he said something along the lines of "you think I'm playing,"[2] grabbed a gun[3] from someone to his left, and fired around five shots into Johnson's apartment. The two men were near Jenkins when he was standing outside of Johnson's apartment, but neither Collins nor Wilson knew them. Defense counsel asked both of them about a "light skinned" male. Collins did not remember anyone by that description, but Wilson said that Jenkins got the pistol from "that light skinned person." Notwithstanding the variations in their testimonies, Collins and Wilson were both adamant that Jenkins was the only person who shot into Johnson's apartment.

¶5. The prosecution also called three law-enforcement officers who testified about their participation in the case. Officer Bruce Broach testified that he secured the scene, placed cards next to the five shell casings that he saw, and noted the other evidence that he found. Crime Scene Investigator Mamie Barrett explained that four shell casings were recovered outside of Johnson's apartment, and one was approximately six feet inside of the apartment. She also testified that she found one bullet in the right side of the exterior door jamb. She recovered two more bullets in the back wall of the apartment. Detective Ella Thomas testified that she was in charge of the investigation, which indicated that although two people were with Jenkins—one of whom was described as tall and "bright skinned or light

---

[2] Collins's testimony was slightly different than Wilson's. According to Collins, Jenkins said "[T]his [epithet omitted] think[s] I'm playing with him." Wilson testified that Jenkins said "[M]an, you think I'm playing . . . ."

[3] Collins said Jenkins fired a chrome revolver. When defense counsel asked Wilson to "describe the gun[,]" Wilson answered, "It was black."

skinned"—her investigation indicated that Jenkins was the only person who shot into Johnson's apartment.

¶6.     The prosecution's other two witnesses provided expert testimony. Dr. Brent Davis, a forensic pathologist, performed Johnson's autopsy. Dr. Davis testified that he recovered two bullets in Johnson's chest, and those gunshot wounds were the cause of Johnson's death. Felicia McIntyre, a forensic scientist specializing in firearm-and-tool mark identification, testified that she examined all five of the bullets and shell casings that were recovered. She explained that they were all the same caliber, the bullets were all fired from the same gun, and the shell casings were all ejected from the same gun. However, she said that "[t]here is no test to determine if a projectile originated in [a particular] cartridge case." In other words, she could not "put the bullet back into the casing." Even so, she opined that "the presence of a second gun is not likely."

¶7.     After the prosecution rested its case-in-chief, defense counsel requested a directed verdict. The circuit court denied that motion. Defense counsel then rested without presenting any evidence, and the prosecution finally rested. The jury subsequently found Jenkins guilty of second-degree murder. After conducting a sentencing hearing, the circuit court sentenced Jenkins to forty years in the custody of the Mississippi Department of Corrections, with ten years suspended and thirty years to serve, followed by five years of "supervised probation." Following his unsuccessful post-trial motion, Jenkins appeals.

## DISCUSSION

4

## I.   Aiding and Abetting Instruction

¶8.    Jenkins takes issue with Jury Instruction S-7, which read, "[I]f two or more persons engaged in the commission of the crime, then the acts of each on the commission of such crime are binding upon all, and all are equally responsible for the acts of each in the commission of such crime."  According to Jenkins, Instruction S-7 was an incomplete and incorrect legal statement because it would allow the jury to find him guilty as an aider and abetter without necessarily finding that Jenkins had the requisite state of mind, which was that Jenkins had intended to kill or shoot Johnson.  He reasons that the jury was misled into thinking that it could return a guilty verdict without finding beyond a reasonable doubt that he committed all elements of the offense.  We review the circuit court's decision for abuse of discretion. *Stanfield v. State*, 269 So. 3d 1188, 1190 (¶15) (Miss. 2019).  "The instructions actually given must be read as a whole.  When so read, if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found."  *Id*.

¶9.    Jenkins is correct that in and of itself Instruction S-7 does not follow the pattern instruction for aiding and abetting that the Mississippi Supreme Court adopted in *Milano v. State*, 790 So. 2d 179, 185 (¶21) (Miss. 2001).  The prosecution submitted a proper *Milano* instruction, but the circuit court refused it after defense counsel objected to it.  But the hinge of propriety for an aiding and abetting instruction is whether it gives "the jury the option of convicting the defendant without first finding that the crime was completed."  *Brassfield v. State*, 905 So. 2d 754, 757 (¶9) (Miss. Ct. App. 2004).  "Absent this deficiency, an aiding and

5

abetting instruction does not constitute reversible error." *Id*. (collecting cases).

¶10.    When the instructions in this case are read as a whole, Instruction S-7 did not allow the jury to find Jenkins guilty without finding that all elements of the offense were committed. As mentioned above, Jenkins was charged with first-degree murder. Instruction S-7 was particularly relevant to that charge based on the evidence that a "light skinned" male handed Jenkins the gun that he fired into Johnson's apartment. Said differently, Instruction S-7 was apparently intended to give the jury the option of finding Jenkins guilty of first-degree murder under the theory that Jenkins and the "light skinned" male premeditated to kill Johnson, and the "light skinned" male's part was to bring the pistol to Johnson's apartment.

¶11.    But the jury found Jenkins guilty of second-degree murder. The jury was instructed that it could not consider second-degree murder unless it had found that Jenkins was not guilty of first-degree murder. Jury Instruction S-4 stated,

> [A]cting with a depraved heart is when a person acts in a highly dangerous way [that] shows that the person does not care for the safety of human life. Even if someone does not intend to kill any particular person, he can still be guilty of murder if he acts with a depraved heart [and] a person is killed as a result.

Our Supreme Court has explained,

> The essential elements of depraved-heart, or "second-degree," murder are "the killing of a human being without the authority of law by any means or in any manner when done in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual."

*Montgomery v. State*, 253 So. 3d 305, 316 (¶42) (Miss. 2018) (quoting Miss. Code Ann.

6

§ 97-3-19(1)(b) (Rev. 2015)). Thus, the jury was instructed on all elements of the offense, and the jury was separately instructed that it must find that Jenkins was guilty of each element beyond a reasonable doubt. Because the instructions, when read as a whole, fairly announce the law of this case, we are not persuaded by Jenkins's assertion.

## II. Impeachment of Wilson

¶12. While cross-examining Wilson, defense counsel asked him whether he was "familiar with guns[.]" Wilson responded, "No, sir. I don't deal with guns[,] period." The prosecution objected to defense counsel's attempt to impeach Wilson with a picture of him that had been posted on social media. The picture "depicts two firearms that are located in [Wilson's] waistband . . . ." During a proffer outside of the jury's presence, Wilson said that he had BB guns when the picture was taken, they were not his BB guns, and they were tucked into his waistband so the picture would not include "the orange tip . . . to know that it was a fake BB gun." The circuit court ultimately granted the prosecution's objection to prevent defense counsel from impeaching Wilson with the pictures because "[i]t's totally on a . . . collateral issue that [is] . . . far more prejudicial than probative of anything . . . with regard to the guilt or innocence of [Jenkins.]"

¶13. According to Jenkins, the circuit court's decision effectively prevented him from presenting a defense. Jenkins notes that Wilson had testified that no one in Johnson's apartment had a gun or removed one from the apartment after the shooting. He adds that "[t]he presence of guns inside the apartment may have provided another explanation of how

7

and why the shooting incident began." He also states that "the jury may have weighed Wilson's credibility differently and determined that Wilson lied in other portions of his testimony." We are mindful that "[l]imitations placed on cross-examination are reviewed using an abuse-of-discretion standard." *Ervin v. State*, 136 So. 3d 1053, 1058 (¶13) (Miss. 2014).

¶14.    We do not conclude that the circuit court's ruling prevented Jenkins from presenting a defense such that reversal is required on appeal. At no point had the defense even implied that Jenkins shot into the apartment because someone inside had a gun. Instead, the defense's theory had been to focus on the concept that a "light skinned" male outside of the apartment was responsible for the shooting. At best, the circuit court's ruling prevented the defense from impeaching Wilson's credibility. Defense counsel should have been allowed to do that. "Any party, including the party that called the witness, may attack the witness's credibility." M.R.E. 607. Even so, "it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Goforth v. State*, 70 So. 3d 174, 187 (¶57) (Miss. 2011). Based on the overwhelming and undisputed testimony and physical evidence in the case, the circuit court's ruling was, at the most, harmless error.

### III.    Comments on Jenkins's Right to Remain Silent

¶15.    Next, Jenkins asserts that Detective Thomas's comments during cross-examination constituted plain error because she twice testified regarding Jenkins's post-*Miranda* silence.[4]

---

[4] *Miranda v. Arizona*, 384 U.S. 426 (1966).

Jenkins also maintains that his trial counsel was ineffective in failing to move for a mistrial due to Thomas's comments on Jenkins's post-*Miranda* silence.

¶16.    The following exchange occurred during Detective Thomas's cross-examination:

Q:      All right.  And so - - and I know you weren't present when the other witnesses testified, but let me give you a hypothetical.  If one witness said my client had a revolver, okay, say, Marcus Collins, hypothetically speaking, is it your testimony that Jeremy Wilson would have said the same thing?

A:      No. I can't say that.  I don't know what they would have said.  He gave the statement that they gave.

Q:      Right.

A:      And neither one of them said anything about a revolver.

Q:      But both of their statements were consistent in specific detail, correct?

A:      They gave events that happened, correct.

Q:      In detail?

A:      In their opinion - - in their recollection of what happened.

Q:      Which you found to be credible or not?

A:      I have no choice.  I have to find them to be credible.  Your client - -

Q:      - - let me ask you this question - -

A:      - - *exercised his right to give a statement and did not provide one.*

Q:      You're saying you have no choice but to find the witnesses credible?  Is that your testimony?

A.      They w[ere] there.  They witnessed what happened.

9

(Emphasis added). Eight pages later in the transcript, the following exchange occurred:

Q: From your investigation were you able to identify who the other individuals were at the door at the time of the shooting?

A: No.

Q: But [someone] was described as a tall bright skinned or light skinned [male]? Do you recall that?

A: Yes.

Q: Were . . . Marcus Collins and Jeremy Wilson . . . shown a photo lineup of the other possible individuals that came to the house?

A. No. There was no way for me to show them a photo lineup without having any names or the other two objects identified. [The only person who could] identify those two subjects was your client[,] . . . and *he exercised his right to remain silent and did not provide a statement.*

(Emphasis added).

¶17. Jenkins's trial counsel did not object to the testimony that his cross-examination elicited. "If no contemporaneous objection is made, the error, if any, is waived." *Robinson v. State*, 247 So. 3d 1212, 1226 (¶27) (Miss. 2018). Nevertheless, Jenkins contends that the testimony at issue resulted in plain error. In *Swinney v. State*, 241 So. 3d 599, 605-06 (¶14) (Miss. 2018), the Supreme Court explained that:

The plain error doctrine is employed only in situations when a defendant's substantive or fundamental rights are affected. Plain-error review is properly utilized for correcting obvious instances of injustice or misapplied law. For the plain-error doctrine to apply, there must have been an error that resulted in a manifest miscarriage of justice or seriously affects the fairness, integrity[,] or public reputation of judicial proceedings.

"To determine whether plain error has occurred, the reviewing court must determine: (1) if

the trial court deviated from a legal rule; (2) whether that error is plain, clear, or obvious; and (3) whether the error prejudiced the outcome of the trial." *Robinson*, 247 So. 3d at 1226 (¶27).

¶18. We do not find that plain error resulted from the testimony at issue. As mentioned above, it was elicited during defense counsel's cross-examination. Essentially, defense counsel asked Detective Thomas why she had not investigated other potential suspects. As a result, she explained why she had been unable to do so—the only person who could have done so declined to steer her toward any other suspects. In light of the overwhelming evidence of Jenkins's guilt, those two comments over the course of the three-day trial did not suggest that Jenkins was guilty because he declined to give a statement. *See Swinney*, 241 So. 3d at 609 (¶34). As the Supreme Court found in *Swinney*, "[w]e discern no manifest miscarriage of justice or that the fairness, integrity, or public reputation of the judicial proceeding was seriously affected." *Id*.

¶19. As for Jenkins's claim that defense counsel was ineffective because he did not move for a mistrial, such claims are generally "more appropriately brought during post-conviction proceedings." *Id*. at 613 (¶58). We review ineffective-assistance claims on direct appeal only where "the record affirmatively shows ineffectiveness of constitutional dimensions," or "the parties stipulate that the record is adequate and the Court determines that findings of fact by a trial judge able to consider the demeanor of witnesses, etc., are not needed." *Id*. The parties have not stipulated that the record is adequate to review this issue on direct

11

appeal, and there may have been tactical reasons that defense counsel chose not to comment on Detective Thomas's responses. Consequently, this issue would be more appropriate in a motion for post-conviction collateral relief. If Jenkins chooses to do so, he may apply for the Supreme Court's leave to assert it in such proceedings.

## IV. Jenkins's Statutory Right to a Speedy Trial

¶20. In his pro se supplemental brief, Jenkins argues that his conviction must be reversed because he was denied his statutory right to a speedy trial. Mississippi Code Annotated section 99-17-1 (Rev. 2015) provides that "[u]nless good cause be shown, and a continuance duly granted by the court, all offenses for which indictments are presented to the court shall be tried no later than two hundred seventy (270) days after the accused has been arraigned." Jenkins was arraigned on March 20, 2015. His trial began 856 days later. According to Jenkins, the continuances in the case were the result of a conspiracy among defense counsel, the prosecution, and the circuit judge. He also asserts that there was not good cause for the court to grant any of the requests for the continuances.

¶21. In *Dies v. State*, 926 So. 2d 910, 914 (¶8) (Miss. 2006), the Mississippi Supreme Court described the necessary two-step analysis:

> The first step is to determine the total number of days between arraignment and trial. For this purpose, the date of arraignment is not counted but the date of trial and weekends are counted unless the 270th day falls on a Sunday. The second step is to consider each delay separately, because only those delays attributable to the State count toward the 270 days. For the second step this Court must determine which party is responsible for the delay and their reason.

(Citations omitted). None of the continuances were solely attributable to the prosecution.

12

Of the eight continuances the circuit court granted, two of them resulted from joint motions. The other six continuances were granted at the defense counsel's request. Jenkins was released on pretrial bond, so he was not jailed for the vast majority of the pretrial period. The record does not contain any indication that Jenkins was dissatisfied with any of the continuances. The orders also reflect that each motion for continuance was "well taken" by the trial court. "A trial court's finding that a motion for continuance is well taken, is the equivalent of a judicial finding of good cause." *Id*. at 915 (¶11). Because none of the delays are attributable to the prosecution, and Jenkins provides no support for his self-serving assertion that the continuances were some sort of conspiracy against him, we are not persuaded by his assertion.

## V. Jenkins's Right to Testify

¶22. Finally, Jenkins argues that he was denied the right to testify. He claims that he did not know he had a right to testify or that he could choose to testify despite his attorney's advice not to. He also claims that his former defense attorney "did not allow him to testify . . . ."

¶23. Jenkins correctly states that the circuit judge never explained his right to choose to testify. After the prosecution rested and defense counsel unsuccessfully moved for a directed verdict, there was no colloquy between Jenkins and the circuit judge. Instead, the circuit court granted a recess so Jenkins and his attorney could "discuss how they were going to proceed." Defense counsel then rested without presenting any evidence. For the first time

13

on appeal, Jenkins says that if he had,

> known [that] he could have testified in his own defense even though his attorney's decision was that he doesn't testify, he would have testified in his own defense, particularly where there were no witnesses at all called by his attorney to testify in support of his defense that he did not shoot anyone at all.

¶24. Among other cases, Jenkins cites *Boykin v. Alabama*, 395 U.S. 238, 242 (1969), in which the United States Supreme Court held, "Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not a waiver." *Boykin* extended the principle to guilty pleas and "the privilege against compulsory self-incrimination[,] . . . the right to trial by jury[,] . . . [and] the right to confront one's accusers . . . ." *Id*. at 243.

¶25. The State responds that because his defense counsel asked during voir dire whether the venire panel understood that Jenkins did not have to testify, Jenkins "must have also been aware that meant he had the right to testify." Additionally, the State asserts that there is no indication that Jenkins wanted to testify, so despite the lack of a colloquy between Jenkins and the circuit judge, Jenkins waived the right to testify when Jenkins did not contradict his defense attorney after he rested without presenting any evidence. We also note that Jenkins did not raise this issue in his post-trial motion.

¶26. Mississippi's jurisprudence on this issue has evolved from *Culberson v. State*, 412 So. 2d 1184 (Miss. 1982). During the hearing on his motion for a new trial, Culberson testified that he told his attorney that he wanted to testify, but his attorney never gave him an

14

opportunity to do so. *Id*. at 1186. Incident to what would now be treated as a motion for post-conviction collateral relief, the Supreme Court remanded "the case for an evidentiary hearing to determine whether Culberson told his attorney [that] he wanted to testify . . . and whether the attorney disregarded the request and refused to permit Culberson to testify . . . ." *Id*. The Supreme Court also suggested that "in any case where a defendant does not testify, before the case is submitted to the jury, the defendant should be called before the court out of the [jury's] presence . . . and advised of his right to testify." *Id*. Furthermore, "[a] record should be made . . . so that no question about [the] defendant's waiver of his right to testify should ever arise in the future." *Id*. at 1186-87. Regardless of whether a trial judge or defense counsel prevents a defendant from testifying, the result is a violation of his constitutional right to testify on his own behalf. *Id*. at 1186.

¶27. Since the Supreme Court handed down *Culberson*, Mississippi appellate courts have clarified that trial judges should ensure that they make a record of the fact that they had advised defendants of their right to testify and inquired whether they intended to do so; but that was only a "strong" suggestion rather than an absolute requirement. *Shelton v. State*, 445 So. 2d 844, 847 (Miss. 1984); *Walker v. State*, 823 So. 2d 557, 561-62 (¶7) (Miss. Ct. App. 2002). Thus, when an appellant had been "represented by counsel throughout the proceeding and the record does not reflect any desire by [the] appellant to testify, the failure of the trial court to advise [him] of his right to testify does not constitute reversible error." *Shelton*, 445 So. 2d at 847.

15

¶28. The right to testify in one's own defense has been described as "fundamental." *Spearman v. State*, 58 So. 3d 30, 34-35 (¶14) (Miss. Ct. App. 2011) (citing *Rock v. Arkansas*, 483 U.S. 44, 51-53 (1987)).[5] An appellate court should "indulge every reasonable presumption against waiver of a fundamental constitutional right." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). Nevertheless, waiver by silence is not legally impossible. When defense counsel rests without calling the defendant and the defendant does not complain that he wants to testify, the defendant's silence is "prima facie proof that counsel was following [the defendant's] wishes . . . ." *Howard v. State*, 171 So. 3d 566, 573 (¶31) (Miss. Ct. App. 2015); *see also Jaco v. State*, 574 So. 2d 625, 634 (Miss. 1990) (finding no denial of defendants' right to testify where there was no *Culberson* colloquy, their attorneys rested without presenting any evidence, "[n]othing suggests that either defendant indicated of record a desire to testify," and "the point was not presented in any way . . . at trial . . ."); *Arrington v. State*, 69 So. 3d 29, 31-32 (¶¶4-8) (Miss. Ct. App. 2011) (During a *Culberson* colloquy, the defendant initially said he wanted to testify, defense counsel then announced that the defendant reconsidered and chose not to testify, and the defendant did not subsequently "express a desire to testify . . . ."); *Walker*, 823 So. 2d at 561 (¶6) (There was no *Culberson* colloquy, nothing in the record suggested that the defendant wanted to testify,

---

[5] "Even more fundamental to a personal defense than the right of self-representation . . . is an accused's right to present his own version of events in his own words. A defendant's opportunity to conduct his own defense by calling witnesses is incomplete if he may not present himself as a witness." *Rock*, 483 U.S. at 52.

and the point was not "available to" him on appeal because he did not raise it at trial.).

¶29. Even so, "the defendant is still allowed an opportunity to prove his counsel somehow denied him the opportunity to testify." *Howard*, 171 So. 3d at 573 (¶31). So while a defendant's silence "should not amount to an absolute waiver of [a defendant's] claims" that he was denied the right to testify, *id*. at 570 (¶23), conduct (e.g., silence) can amount to a waiver as long as the waiver was knowing and voluntary. *Id*. at 572 (¶30). But if a defendant is unaware of his right to testify, he cannot knowingly or voluntarily waive it. *Dizon v. State*, 749 So. 2d 996, 999 (¶15) (Miss. 1999).

¶30. There are exceptional circumstances when a trial court should obtain an express waiver. One such set of circumstances occurred in *Dizon*. In that case, there was no *Culberson* colloquy. *Id*. at 999 (¶15). After remanding the case for an evidentiary hearing to resolve whether Dizon had been advised of his right to testify and whether he had effectively waived it, *id*. at 998 (¶10), the Mississippi Supreme Court reversed Dizon's conviction and remanded for a new trial. *Id*. at 1001 (¶27). During the evidentiary hearing, Dizon said that his former defense attorney did not advise him of his right to choose to testify, and defense counsel could not definitively say that he had advised Dizon of his rights. *Id*. at 999-1000 (¶¶16, 18). And because defense counsel's opening statement put the trial judge on notice that Dizon wanted to testify, the trial court should have expressly advised Dizon of his constitutional right to choose to testify. *Id*. at 1000 (¶¶22, 25).

¶31. In *Spearman*, 58 So. 3d 30, 32-33 (¶7) (Miss. Ct. App. 2011), the accused told the trial

17

judge that he wanted to testify after a *Culberson* colloquy, but defense counsel then rested without presenting any evidence. After remanding the case for an evidentiary hearing as to whether the transcript was accurate, this Court was "unable to conclude from the record and . . . the hearing that Spearman's constitutional right to testify was adequately protected." *Id*. at 34 (¶13).

¶32. In both *Dizon* and *Spearman*, the trial judges should have obtained an express waiver because there was reason to believe that the defendants would choose to testify. In contrast, an express waiver is unnecessary when a trial judge "has no reason to believe that the defendant's own attorney is frustrating his or her desire to testify . . . ." *Howard*, 171 So. 3d at 574 (¶37) (quoting *United States v. Pennycooke*, 65 F.3d 9, 13 (3d Cir. 1995)).

¶33. During defense counsel's opening statement, he said that the jury would hear evidence that Jenkins arrived home from work and found that some of his property had been stolen, so Jenkins was looking for his missing property when he went to Johnson's apartment. Defense counsel also told the jurors that they would hear evidence that two or three people arrived at Johnson's apartment separately but nearly simultaneously as Jenkins did. The prosecution objected after defense counsel said that the jury would hear that someone with the nickname "Jay Rock" was armed when he arrived, and he was the person who shot into Johnson's apartment.

¶34. Outside of the jury's presence, the prosecution noted that during voir dire defense counsel said he would not call any witnesses. The prosecution then said that none of its

18

witnesses would testify according to defense counsel's representations. The prosecution reasoned that defense counsel was misleading the jury. Defense counsel responded that he expected to elicit evidence consistent with his representations when he cross-examined witnesses for the prosecution. But he also said that if he was not able to elicit that evidence during cross-examination of prosecution witnesses, then Jenkins "may have to testify about that." After further discussion, defense counsel again reiterated that he expected to elicit evidence consistent with his representations when he cross-examined witnesses for the prosecution. When the jury returned to the courtroom, defense counsel's opening statement resumed. He said the evidence would show that Jenkins turned himself in twenty-four hours after the shooting. He also suggested that Jenkins had not changed clothes since the shooting, and authorities neglected to test his hands and clothing for gunshot residue.

¶35.    To summarize, the record does not show that Jenkins ever personally expressed a desire to testify. Instead, *defense counsel* said that Jenkins *may* need to testify if cross-examination did not produce evidence consistent with defense counsel's representations. By extension, Jenkins would not need to testify if defense counsel elicited that evidence, which, for the most part, was in fact adduced during cross-examination.

¶36.    It would have certainly been better for the circuit judge to engage in the colloquy contemplated in *Culberson*. But that colloquy is not an absolute requirement. The question is whether Jenkins was *denied* the right to testify. "It is extremely common for criminal defendants not to testify, and there are good reasons for this . . . . Yet it is simple enough

19

after being convicted for the defendant to say, 'My lawyer wouldn't let me testify. Therefore I'm entitled to a new trial.'" *Underwood v. Clark*, 939 F.2d 473, 475 (7th Cir. 1991). Given the precise circumstances of this case, it would be unreasonable to say that the state of the evidence was such that the circuit court should have been surprised that Jenkins did not speak up and say he wanted to testify. It necessarily follows that it is not unreasonable to presume that Jenkins waived his right to testify when he said nothing after defense counsel rested without presenting any evidence. It is also noteworthy that during Jenkins's sentencing hearing, Jenkins did not contradict defense counsel when he said that Jenkins "could have stated and given a whole lengthy recitation of what occurred or what did not occur, but, of course, he exercised his right not to do so . . . ." Under the precise circumstances of this case, we find that the circuit court did not deprive Jenkins of the right to testify. Thus, this issue is meritless. However, to the extent that Jenkins is claiming that defense counsel was ineffective, we again find that that issue is more appropriate during post-conviction proceedings. *Arrington*, 69 So. 3d at 32 (¶8). If Jenkins chooses to do so, he may seek the Mississippi Supreme Court's leave to raise that claim in motion for post-conviction collateral relief.

¶37. **AFFIRMED.**

**CARLTON, P.J., GREENLEE, TINDELL, McDONALD, LAWRENCE AND C. WILSON, JJ., CONCUR. BARNES, C.J., AND McCARTY, J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. J. WILSON, P.J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**

20