# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2021-KA-00828-SCT

*ROBERT FISHER, JR.*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/19/2021 |
| TRIAL JUDGE: | HON. BARRY W. FORD |
| TRIAL COURT ATTORNEYS: | SHARON ALGENA SPENCER |
| | TIMOTHY CRAIG HOWARD |
| | AKILLIE MALONE OLIVER |
| | WINSTON JAMES THOMPSON, III |
| COURT FROM WHICH APPEALED: | YAZOO COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | LOUWLYNN VANZETTA WILLIAMS |
| ATTORNEY FOR APPELLEE: | ALLISON KAY HARTMAN |
| DISTRICT ATTORNEY: | AKILLIE MALONE OLIVER |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 11/17/2022 |

**BEFORE RANDOLPH, C.J., COLEMAN AND CHAMBERLIN, JJ.**

**RANDOLPH, CHIEF JUSTICE, FOR THE COURT:**

¶1.     Robert Fisher appeals his convictions for several drug possession and trafficking charges and his sentence as a habitual offender by the Yazoo County Circuit Court. Fisher argues that his right to testify was violated, that officers unlawfully searched a storage unit he was leasing, and that the trial judge sentenced him as a habitual offender without sufficient evidence.

## FACTUAL AND PROCEDURAL HISTORY

¶2.     On Monday, May 20, 2019, Robert Fisher placed approximately thirty-one kilograms of marijuana in a storage unit he was leasing at Davis Mini Storage in Yazoo City. Davis

Mini Storage is owned by Tim Davis and consists of approximately 450 units divided among eighteen buildings, some climate controlled and others not. The unit leased by Fisher was located in the third climate-controlled building, which housed twenty to thirty units.

¶3. On Wednesday, May 22, 2019, officers from the Yazoo County Sheriff's Office were dispatched to Davis Mini Storage after Davis received a complaint from a customer about a strong odor of marijuana in the third climate-controlled building. Deputy Ferrell, one of the officers dispatched to the scene, stated that once he entered Building 3, he smelled the distinctive odor of what he knew to be marijuana based on his knowledge, training, and experience. Davis gave the officers permission to search the common areas in Building 3. The officers walked the hallways and noticed that the smell was strongest among one set of units but would weaken as they moved beyond those units. According to Ferrell, the blowing of the air conditioner in the climate-controlled building made it difficult to pinpoint the source of the smell. Davis therefore provided a ladder to allow Ferrell to rise above the stream of blowing air and pinpoint the unit.

¶4. Ferrell climbed the ladder and determined the odor was coming from Unit 404. From that vantage point, he could see several large bundles in black trash bags.[1] Davis informed the officers that Fisher was leasing Unit 404. Investigator Gann subsequently obtained a search warrant for Unit 404, and the officers executed the warrant, opened the unit, and confirmed that the bags contained marijuana.

¶5. Gann then obtained an arrest warrant for Fisher and a search warrant for Fisher's

---

[1] Ferrell testified that he "had no clue" that the units were open from the top until he climbed the ladder and looked down.

home. There, officers found marijuana, hydromorphone tablets, amphetamine tablets, methamphetamine, cocaine, and several firearms. Fisher was taken into custody.

¶6. At his trial, Fisher offered no objections to the admission of the marijuana seized from the storage unit. After the State rested its case, Fisher rested his case and did not testify. The jury returned guilty verdicts for all but one count. Fisher was convicted of two counts of possessing marijuana, one count of aggravated trafficking of cocaine, one count of aggravated trafficking of schedule II methamphetamine, one count of trafficking amphetamine, and one count of trafficking hydromorphone.

¶7. At sentencing, the judge found that Fisher was a habitual offender under Mississippi Code Section 99-19-81. As such, the judge was required either to sentence Fisher to the maximum sentence for each of his felony convictions or to note his reasons for deviating from the maximum sentence. After listing several mitigating circumstances, the judge deviated from the maximum sentence and instead sentenced Fisher to the mandatory minimum sentence required for each of his two aggravated trafficking convictions.[2] Fisher was sentenced to two consecutive twenty-five year terms without possibility of reduction, probation, or parole. The sentences for his other convictions were to be served concurrently with the two twenty-five year sentences.

¶8. The trial court denied Fisher's motions for a new trial and judgment notwithstanding the verdict.

---

[2] Mississippi Code Section 41-29-139(g) requires a mandatory minimum sentence of twenty-five years without possibility of probation, reduction, or parole upon conviction for aggravated trafficking.

## STATEMENT OF THE ISSUES

¶9. Fisher presents three issues: (1) whether he was deprived of his constitutional right to testify in his own defense, (2) whether looking into a ceilingless storage unit from a ladder constituted an unlawful search, and (3) whether the trial court erred by sentencing him as a habitual offender.

## STANDARD OF REVIEW

¶10. Fisher raises all of his arguments for the first time on appeal. "Generally, a party who fails to make a contemporaneous objection at trial must rely on plain error to raise the issue on appeal, because otherwise it is procedurally barred." *Swinney v. State*, 241 So. 3d 599, 605 (Miss. 2018) (internal quotation marks omitted) (quoting *Parker v. State*, 30 So. 3d 1222, 1227 (Miss. 2010)).

¶11. The plain error doctrine permits this Court to "recognize obvious error which was not properly raised by the defendant and which affects a defendant's 'fundamental, substantive right.'" *Shinstock v. State*, 220 So. 3d 967, 970 (Miss. 2017) (internal quotation marks omitted) (quoting *Conners v. State*, 92 So. 3d 676, 682 (Miss. 2012)). "[T]o 'determine if plain error has occurred, we must determine if the trial court has deviated from a legal rule, whether that error is plain, clear[,] or obvious, and whether the error has prejudiced the outcome of the trial.'" *Green v. State*, 183 So. 3d 28, 30 (Miss. 2016) (second alteration in original) (quoting *Neal v. State*, 15 So. 3d 388, 403 (Miss. 2009)). Additionally, "[f]or the plain-error doctrine to apply, there must have been 'an error that resulted in a manifest miscarriage of justice or "seriously affect[s] the fairness, integrity or public reputation of

judicial proceedings."'" *Hall v. State*, 201 So. 3d 424, 428 (Miss. 2016) (second alteration in original) (quoting *Brown v. State*, 995 So. 2d 698, 703 (Miss. 2008)).

## DISCUSSION

**I.      Whether Fisher was denied the right to testify on his own behalf.**

¶12.    Fisher argues that the trial court failed to protect his constitutional right to testify by not questioning his failure to testify or notifying him of his right to make the decision about whether to testify. As Fisher correctly notes, the record fails to reflect such an inquiry.

¶13.    The right to testify in one's own defense in a criminal proceeding is a constitutional right secured by the Fifth and Sixth Amendments of the United States Constitution and applied against the states through the Due Process Clause of the Fourteenth Amendment of the United States Constitution. *Rock v. Arkansas*, 483 U.S. 44, 51, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987) ("The necessary ingredients of the Fourteenth Amendment's guarantee that no one shall be deprived of liberty without due process of law include a right to be heard and to offer testimony[.]"). Article 3, section 26, of the Mississippi Constitution likewise "gives an accused the right to testify in his own behalf." *Culberson v. State*, 412 So. 2d 1184, 1186 (Miss. 1982). Moreover, "the denial of the right of an accused to testify is a violation of his constitutional right regardless of whether the denial stems from the refusal of the court to let a defendant testify . . . or whether the denial stems from the failure of the accused's counsel to permit him to testify." *Id.* (citation omitted). And, while the United States Supreme Court has not specifically addressed what role a court should play in protecting a defendant's right to testify, we have.

5

¶14. In *Culberson*, we advised trial courts that "in any case where a defendant does not testify, before the case is submitted to the jury, the defendant should be called before the court out of the presence of the jury, and advised of his right to testify." *Id.* We have noted since *Culberson*, however, that this was merely a strong suggestion and not a mandatory directive. *Shelton v. State*, 445 So. 2d 844, 847 (Miss. 1984). "[I]nasmuch as [the defendant] was represented by counsel throughout the proceeding and the record does not reflect any desire by [the defendant] to testify, the failure of the trial court to advise [the defendant] of his right to testify does not constitute reversible error." *Id.* As in *Shelton*, Fisher was represented by counsel throughout the proceeding and, as Fisher concedes, the record is silent as to whether he desired to testify or knew of his right to testify. Accordingly, the failure of the trial court to advise Fisher of his right to testify is not reversible error.

¶15. The cases Fisher relies on in his brief to this Court are distinguishable. In *Dizon v. State*, 749 So. 2d 996, 1000-01 (Miss. 1999), this Court reversed a conviction due, in part, to the trial court's failure to make a record regarding the defendant's decision not to testify. But Dizon, unlike Fisher, expressed his desire to testify in numerous instances. *Id.* This Court noted, "[t]rial counsel stated during opening statements that Dizon would testify[,]" and, when he did not testify, that "in itself should have been enough to trigger an inquiry by the judge as to whether or not it had been explained to Dizon that he had a constitutional right to testify and whether or not he had waived that right." *Id.* Additionally, pursuant to an order from this Court, the trial court conducted a separate evidentiary hearing on whether Dizon was denied his constitutional right to testify. *Id.* at 998. At that hearing, trial counsel was

6

uncertain whether Dizon had been informed of his right to testify. *Id.* at 1000. Meanwhile, Dizon testified that he had never been informed of that right and that he "repeatedly told [his counsel] that he wanted to testify." *Id.* at 1000. It was those assertions that led this Court to reverse Dizon's conviction and not, as Fisher contends, solely the trial court's failure to make a record regarding the defendant's decision not to testify. Because there are no such assertions in this record, Fisher's use of *Dizon* is unpersuasive.

¶16.   Fisher cites *Boykin v. Alabama*, 395 U.S. 238, 89 S. Ct. 1709, 23 L. Ed. 2d 247 (1969), to support his argument that a waiver of the constitutional right to testify cannot be presumed from a silent record. *Boykin*, however, dealt with the voluntariness of a guilty plea and held that a waiver of the privilege against self-incrimination and the right to trial by jury cannot be presumed from a silent record. *Id.* The United States Supreme Court has never extended *Boykin* to the right to testify. And Fisher fails to cite any case in which any Mississippi court or any federal court has held that waiver of the right to testify cannot be found from a silent record. In fact, this Court has held that there is no violation of the defendant's right to testify when the record was silent on the defendant's desire to testify. *Jaco v. State*, 574 So. 2d 625, 634 (Miss. 1990) ("Nothing suggests that either defendant indicated of record a desire to testify, nor is there any course of proceedings in chambers wherein the Court advised Steve and Jerry Jaco of their right of allocution."); *Shelton*, 445 So. 2d at 847. Thus, we find no basis to support Fisher's argument that he was denied his right to testify on his own behalf.

II.    **Whether climbing a ladder and looking into a ceilingless storage unit constituted an unlawful search.**

7

¶17. Fisher argues that the officers' use of a ladder to look into a storage unit he was leasing constituted an unlawful search under the Fourth Amendment of the United States Constitution and article 3, section 23, of the Mississippi Constitution and that the evidence subsequently seized should have been suppressed. Notably, Fisher failed to raise this argument in a motion to suppress, by a contemporaneous objection, or in his motions for a new trial and judgment notwithstanding the verdict. He must, therefore, rely on the plain error doctrine to maintain his argument. *See Swinney*, 241 So. 3d at 605 (quoting *Parker*, 30 So. 3d at 1227). The plain error doctrine permits this Court to "recognize obvious error which was not properly raised by the defendant and which affects a defendant's fundamental, substantive right." *Shinstock*, 220 So. 3d at 970 (internal quotation marks omitted) (quoting *Conners*, 92 So. 3d at 682). Still, Fisher's argument falls short, for "the record reveals no obvious error." *Id.*

¶18. Fisher contends that the officers conducted an unlawful search when they climbed a ladder and looked into a ceilingless storage unit. Fisher fails to mention, however, the search warrant the officers obtained prior to entering the unit. He challenges only the officers' actions prior to obtaining the warrant. Therefore, our review is limited to whether an unlawful search took place when the officers looked into the storage unit.

¶19. Both the Fourth Amendment of the United States Constitution, as applied to the states through the Fourteenth Amendment of the United States Constitution, and article 3, section 23, of the Mississippi Constitution protect persons from unreasonable searches and seizures. *Cooper v. State*, 145 So. 3d 1164, 1168 (Miss. 2014); *see also Mapp v. Ohio*, 367 U.S. 643,

655, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961). In construing the Fourth Amendment, we follow the decisions of the United States Supreme Court. *Sutton v. State*, 337 So. 3d 208, 211 (Miss. 2022) (citing *Isaacks v. State*, 350 So. 2d 1340, 1343 (Miss. 1977)).

¶20. A search occurs when the government either trespasses on a constitutionally protected area or violates a subjective expectation of privacy that society recognizes as reasonable in "an attempt to find something or to obtain information." *United States v. Jones*, 565 U.S. 400, 408 n.5, 132 S. Ct. 945, 181 L. Ed. 2d 911 (2012); *see also Baker v. State*, 802 So. 2d 77, 79 (Miss. 2001) (citing *Katz v. United States*, 389 U.S. 347, 361, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967)). The United States Supreme Court has called the first part the trespassory test and the second part the reasonable expectation of privacy test. *Jones*, 565 U.S. at 409 ("[T]he *Katz* reasonable-expectation-of-privacy test has been *added to*, not *substituted for*, the common-law trespassory test."). We examine the officers' conduct under both tests.

### A. Trespass

¶21. Under the trespassory test, there must be an intrusion into an area of the defendant's that is constitutionally protected. *Jones*, 565 U.S. at 408 n.5. Under article 3, section 23, this constitutionally protected area extends to all land owned by the person searched. *Arnett v. State*, 532 So. 2d 1003, 1010 (Miss. 1988); *see also Davidson v. State*, 240 So. 2d 463, 464 (Miss. 1970) ("[Jones] committed a trespass when he went upon the appellant's lands, thus making his search of the tractor illegal.").

¶22. Fisher has never claimed that the officers physically entered the storage unit prior to obtaining a search warrant. He merely argues that the act of looking over and into the storage

9

unit he was leasing was unlawful. The record reflects that the officers were called to Davis Mini Storage because of an odor of marijuana. At the owner's request, the officers entered Building 3 and, following their sense of smell, narrowed the source down to a set of units. It was only when they could not further isolate the source due to the blowing of the air conditioner that they obtained a ladder from Davis. The officers were unaware that they could view the contents of the units from above. They were seeking to isolate the source of the odor. It was only when Ferrell reached the top of the ladder that the officers realized the units were open. The officers remained in the common area and did not physically enter the unit until they had obtained a search warrant. The only intrusion into the unit was from the officers' eyes, which cannot commit a trespass. *Wilson v. State*, 186 So. 2d 208, 211 (Miss. 1966) (citing *Corn v. State*, 250 Miss. 157, 164 So. 2d 777, 779 (1964)). "The eye cannot be a trespasser. So, also, the ear cannot be a trespasser, unless the person looking or listening is, at the time of the hearing or seeing, a trespasser." *Goode v. State*, 158 Miss. 616, 131 So. 106, 108 (1930). At the time of the seeing, the officers were positioned in an area where they had permission to be. The officers did not commit a trespass and, therefore, did not conduct a search under the trespassory test.

### B.     *Reasonable Expectation of Privacy*

¶23.    Under the reasonable expectation of privacy test, officers must violate a defendant's expectation of privacy that society recognizes as reasonable. *Cooper*, 145 So. 3d at 1174; *Baker*, 802 So. 2d at 79 (citing *Katz*, 389 U.S. at 361); *see also Illinois v. Andreas*, 463 U.S. 765, 771, 103 S. Ct. 3319, 77 L. Ed. 2d 1003 (1983). This test involves two components.

*California v. Ciraolo*, 476 U.S. 207, 211, 106 S. Ct. 1809, 90 L. Ed. 2d 210 (1986). First, the defendant must manifest a subjective expectation of privacy. *Id.* Second, the expectation of privacy must be one that society is prepared to recognize as reasonable. *Id.*

¶24.    Fisher argues that he "clearly had an expectation of privacy" in the storage unit because he leased the unit and placed locks on the door. Therefore, he argues, when the officers looked into the unit, "a clear violation of [his] Fourth Amendment right occurred." Fisher fails to demonstrate, however, that he had either a subjective or a reasonable expectation of privacy in a storage unit open at the top. The fact that Fisher leased the unit and placed locks on the door does not establish that he subjectively expected privacy from someone looking into the unit. Had Fisher wanted to conceal the contents of his unit from onlookers, he could have covered the contents with something like a tent or a tarp. Moreover, Fisher fails to cite any authority regarding a person's reasonable expectation of privacy in a storage unit with no ceiling. In fact, he fails to even argue in his brief that he had a reasonable expectation of privacy. Nevertheless, we find, based on several factors in this case, that Fisher did not have a reasonable expectation of privacy in the contents of the unit as seen by the officers from a ladder.

¶25.    "[C]apacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Minnesota v. Carter*, 525 U.S. 83, 88, 119 S. Ct. 469, 142 L. Ed. 2d 373 (1998) (second alteration in original) (internal quotation marks omitted) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978)). Here,

the invaded place is a commercial storage unit without a ceiling. The unit is not a residence,[3] a place that receives strong constitutional protection due to the "overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic." *Oliver v. United States*, 466 U.S. 170, 178, 104 S. Ct. 1735, 80 L. Ed. 2d 214 (1984) (internal quotation mark omitted) (quoting *Payton v. New York*, 445 U.S. 573, 601, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980)). Instead, the unit is part of a commercial premises. And the "expectation of privacy in a commercial premises . . . is different from, and indeed less than, a similar expectation in an individual's home." *New York v. Burger*, 482 U.S. 691, 700, 107 S. Ct. 2636, 96 L. Ed. 2d 601 (1987).

¶26. According to Davis's testimony, the commercial facility contains 450 units divided into eighteen buildings. Building 3 itself contained between twenty and thirty units. That meant there were potentially twenty to thirty lessees who, like Fisher, could access Building 3 to use their storage unit.

¶27. Building 3 was also accessible and controlled by the management of Davis Mini Storage. Management could have allowed unlimited access to the building to conduct maintenance or repairs, such as on the HVAC unit and light fixtures. Management also could have allowed access for pest control services or for prospective tenants to tour the facilities. Management had control over who had permission to be in Building 3, and they chose to give permission to the officers to search the common area. Management also had an interest in

---

[3] According to Fisher's rental agreement with Davis Mini Storage, "[c]ustomer shall have access to the rental space only for the purpose of storing and removing property stored in that rental space. The rental space *shall not be used for residential purposes*." (Emphasis added.)

12

keeping its facilities free from the presence and smell of marijuana. In fact, in his rental agreement, Fisher agreed that he would not store any "illegal goods" in the unit and that he would not use the unit "for any unlawful purpose."

¶28.    In sum, Fisher leased a storage unit without a ceiling in a commercial facility that was accessible not only by management but also by many others. Additionally, Building 3 was controlled by management,[4] which was entitled to allow anyone it desired to have access to the building, to search the building's common area, and to use the facility's ladder. Based on these factors, Fisher did not have a reasonable expectation of privacy in the contents of the ceilingless unit as seen from a ladder. Thus, the officers' use of a ladder to look into the unit leased by Fisher was not a search under the reasonable expectation of privacy test.

¶29.    When the officers climbed a ladder and looked into Fisher's storage unit, they did not conduct a search under the Fourth Amendment of the United States Constitution or article 3, section 23, of the Mississippi Constitution. The officers were positioned in a common area with the permission of the building owner when they saw the bundles in the unit. Fisher likewise did not have a subjective or reasonable expectation of privacy in objects that were visible to the officers from the ladder. Because no search occurred, there was no violation of Fisher's rights under either the Fourth Amendment or article 3, section 23.

**III.    Whether Fisher was improperly sentenced as a habitual offender.**

¶30.    "A sentencing hearing on a defendant's habitual-offender status must occur separately

---

[4] Fisher's rental agreement reads, "Customer's access to the premises may be conditioned in any manner deemed reasonably necessary by DAVIS MINI STORAGE to maintain order on the premises."

13

from the trial on the principal charge." ***Conner v. State***, 138 So. 3d 143, 151 (Miss. 2014) (citing URCCC 11.03 (deleted July 1, 2017)). The State has the burden of proving beyond a reasonable doubt that the defendant is an habitual offender. ***Id.*** The applicable statute reads as follows:

> Every person convicted in this state of a felony who shall have been convicted twice previously of any felony or federal crime upon charges separately brought and arising out of separate incidents at different times and who shall have been sentenced to separate terms of one (1) year or more in any state and/or federal penal institution, whether in this state or elsewhere, shall be sentenced to the maximum term of imprisonment prescribed for such felony . . . , and such sentence shall not be reduced or suspended nor shall such person be eligible for parole or probation.

Miss. Code. Ann. § 99-19-81 (Rev. 2020). "All that is required is that the accused be properly indicted as an habitual offender; that the prosecution prove the prior offenses by competent evidence; and that the defendant be given a reasonable opportunity to challenge the prosecution's proof." ***Keyes v. State***, 549 So. 2d 949, 951 (Miss. 1989) (citations omitted).

¶31.    Fisher contends, and the State agrees, that the prosecution failed to present sufficient evidence to prove Fisher's status as a habitual offender. Though the trial court held a separate sentencing hearing at which Fisher was sentenced as a habitual offender, the prosecution presented no evidence of Fisher's prior convictions. "Simply put, the State failed to prove [Fisher's] prior convictions by competent evidence." ***Grayer v. State***, 120 So. 3d 964, 969 (Miss. 2013).

¶32.    Notably, Fisher failed to make this argument before the trial court. He must, therefore, rely on the plain error doctrine to maintain his argument. *See* ***Swinney***, 241 So. 3d at 605

14

(quoting **Parker**, 30 So. 3d at 1227). "[T]o 'determine if plain error has occurred, we must determine if the trial court has deviated from a legal rule, whether that error is plain, clear[,] or obvious, and whether the error has prejudiced the outcome of the trial.'" **Green**, 183 So. 3d at 30 (second alteration in original) (quoting **Neal**, 15 So. 3d at 403). Moreover, "[f]or the plain-error doctrine to apply, there must have been 'an error that resulted in a manifest miscarriage of justice or "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings."'" **Hall**, 201 So. 3d at 428 (second alteration in original) (quoting **Brown**, 995 So. 2d at 703).

¶33. At the sentencing hearing, the trial judge found that Fisher was a habitual offender under Mississippi Code Section 99-19-81. This required Fisher to "be sentenced to the maximum term of imprisonment prescribed for such felony unless the court provides an explanation in its sentencing order setting forth the cause for deviating from the maximum sentence." § 99-19-81. Fisher, however, was not sentenced to the statutory maximum for his offenses. Instead, the trial judge departed downward in his sentencing due to Fisher's life expectancy, his cooperation with police, the lack of injuries during the bust, and the lack of evidence showing he held a leadership role in selling drugs.

¶34. Fisher was sentenced to two twenty-five year sentences for aggravated trafficking, under Section 41-29-139(g), to be served consecutively without the possibility of reduction, probation, or parole. Under Section 41-29-139(g), the defendant "shall be sentenced to a term of not less than twenty-five (25) years nor more than life in prison[.]" Miss. Code Ann. § 41-29-139(g) (Rev. 2018). Further, "the twenty-five year sentence shall be a mandatory sentence

15

and shall not be reduced or suspended. The person shall not be eligible for probation or parole[.]" *Id.* There is, therefore, no reason for the case to be sent back for resentencing, as Fisher requests, because Fisher's two twenty-five year terms without possibility of parole, reduction, or suspension are already the lightest sentences he could receive for those convictions under Section 41-29-139(g). Fisher is, therefore, unable to show that he was prejudiced by the judge's error or that there was "an error that resulted in a manifest miscarriage of justice or 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Hall*, 201 So. 3d at 428 (alteration in original) (internal quotation marks omitted) (quoting *Brown*, 995 So. 2d at 703).

¶35. Fisher's sentence was imposed based on the mandatory minimum required by Mississippi Code Section 41-29-139(g) for an aggravated trafficking conviction, not on his habitual offender status. Though the trial judge found that Fisher was a habitual offender under Section 99-19-81 without sufficient evidence, that action did not impact Fisher's sentence. Therefore, it is unnecessary for Fisher to be resentenced.

## CONCLUSION

¶36. We affirm Fisher's convictions and sentences.

¶37. **AFFIRMED.**

**KITCHENS AND KING, P.JJ., COLEMAN, MAXWELL, BEAM, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR.**